**UNITED STATES of America**
**v.**
**John DILLET, Defendant.**
**No. 66 Cr. 426.**

United States District Court
S. D. New York.
Oct. 14, 1966.

Robert M. Morgenthau, U. S. Atty., Roger J. Hawke, New York City, for plaintiff.

Bernard Moldow, Legal Aid Society, New York City, for defendant.

OPINION

MOTLEY, District Judge.

Defendant, John Dillet, was charged in a two-count indictment, filed May 16, 1966, with a violation of Title 26, U.S.C. Sec. 4705(a).[1] The first count alleges that on July 26, 1965 defendant unlawfully, wilfully and knowingly sold to Cleophus A. Robinson, II, a narcotic drug, cocaine hydrochloride. The second count charges that a similar sale occurred on August 10, 1965. Robinson is an undercover agent of the Federal Bureau of Narcotics. Dillet admits the two sales charged in the indictment. He

1. This statute provides: "It shall be unlawful for any person to sell, barter, exchange, or give away narcotic drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Secretary or his delegate."

testified he never sold or delivered drugs on any other occasion. There was no direct evidence of any prior or subsequent sales.

Defendant asks this court to refrain from imposing the extremely heavy penalties mandated by law on the ground of entrapment.[2] His claim is as follows: The contraband was given to him by the Government's paid informer, a man known to defendant to be engaged in the sale of narcotics, who, knowing defendant was in need of money to pay his rent, asked him to deliver the drugs to Robinson on each occasion for a quick twenty-five dollars.

Defendant's testimony was consistent under cross examination. His answers to questions were direct and distinguished for candor.

There are three crucial disputed factual issues on the question of entrapment, the consideration of which have guided the court in deciding whether the Government carried its burden of proving, on the whole case, that defendant is guilty beyond a reasonable doubt. These issues are as follows:

First, did Westbrook, the Government informer, have narcotics on his person when he went with agent Robinson to meet defendant?

Second, if there is a possibility that Westbrook had narcotics on his person when he went with Robinson to meet defendant, did Westbrook ever have an opportunity to give the drugs to defendant?

Third, if there is a possibility that Westbrook had narcotics on his person, and if he had an opportunity to pass these narcotics to defendant, did West-brook give the narcotics to defendant prior to each sale?

### Findings of Fact

*First Count:*

The evidence is undisputed that on the evening of July 26, 1965, at about 6 P. M., Donald Westbrook, the informer, met narcotics agents Robinson, Collins, and Kofman on the corner of 125th Street and First Avenue in the City of New York. The meeting had been arranged earlier by a telephone call between the informer and Robinson. It was understood that the purpose of the meeting was to make a narcotics "buy" from defendant later that evening.

Westbrook entered the rear of a Government vehicle containing the three agents. While sitting in the back seat of the car, the informer was searched by Robinson for narcotics. There is some doubt as to whether Robinson was in the front or rear seat while conducting the search, because of discrepancy in the testimony of the two agents, Robinson and Collins, who testified on the trial. The only other person who testified was defendant. This search did not reveal any narcotics on the person of the informer. However, Robinson admitted, under cross examination by defense counsel, that it is possible such an awkward search might not uncover ingeniously concealed contraband.

Kofman and Collins left after the search and entered another Government vehicle. Robinson and Westbrook proceeded in a Government vehicle to the corner of 145th Street and Amsterdam Avenue. They parked just beyond the corner facing west on 145th Street. Col-

2. Title 26, U.S.C. Sec. 7237(b) and (d) provide:
"(b) Whoever commits an offense, or conspires to commit an offense, described in section 4705(a) or section 4742(a) shall be imprisoned not less than 5 or more than 20 years and, in addition, may be fined not more than $20,000.
(d) No suspension of sentence; no probation; etc.—Upon conviction—(1) of any offense the penalty for which is provided in subsection (b) of this section, subsec-tion (c), (h), or (i) of section 2 of the Narcotic Drugs Import and Export Act, as amended, or such Act of July 11, 1941, as amended, * * *
the imposition or execution of sentence shall not be suspended, probation shall not be granted, section 4202 of title 18 of the United States Code shall not apply, and the Act of July 15, 1932 (47 Stat. 696; D.C.Code 24–201 and following), as amended, shall not apply."

lins and Kofman drove to the same intersection. They parked on the southeast corner in order to observe the events that would take place. Collins testified that Westbrook then left the car alone and walked up Amsterdam Avenue towards 146th Street where he met defendant.[3]

Westbrook knew where to search for defendant because defendant had chosen this vicinity as the place where he engaged in his illegal business of writing numbers. Defendant testified that in 1965, apparently a few months before the crimes at issue took place, he began writing numbers for which he has been four times convicted. He had been otherwise unemployed. Immediately prior to this period of unemployment and writing numbers, defendant worked at odd jobs. He worked in the garment district. He was employed approximately four years prior thereto at the Fisher Body Company in Tarrytown, New York. He left there in 1964. Defendant spent four years in the Army from which he was honorably discharged in 1954.

Westbrook, an acquaintance of defendant for about five or six years, met defendant who was standing either in front of or across the street from Singleton's Barbeque store. Defendant testified they talked for a few moments. Agent Collins, of course, could not hear the conversation but testified that defendant and Westbrook appeared to engage in conversation for a short time, thus corroborating defendant's testimony. Robinson testified that Westbrook walked up Amsterdam Avenue about fifty feet and called to defendant who then followed Westbrook to the car.

Defendant admits that Westbrook did not have to argue with him or persuade him to take the drugs around the corner to Robinson. He further admits that he knew the envelope contained drugs. The Government let stand defendant's testimony that Westbrook knew defendant needed money to pay his rent and other bills as the result of a prior conversation between defendant and Westbrook. The Government also left unchallenged defendant's assertion that he knew Westbrook sold drugs.

A few minutes after defendant talked to Westbrook, they walked to the agent's car, according to Collins' testimony. Defendant says he waited a few minutes and walked back to the car, where Robinson and Westbrook were seated, alone. There, defendant passed Robinson a *New York Post* newspaper. The centerfold of the paper held a glassine envelope which contained a white powder. Collins' testimony is that defendant appeared to engage Robinson in conversation a short time and left the car almost immediately after receiving the money from Robinson.

There is dispute as to the conversation which took place at the time of this transaction. Robinson testified that the following conversation took place: He said to defendant that he, Robinson, was told defendant had some good cocaine. Defendant replied he had "some very good cocaine" for sale and asked Robinson if he wanted to buy some. Robinson responded affirmatively and asked how much a half ounce would cost. Defendant said he had only a quarter of an ounce of cocaine with him and would sell it for $125.00. Robinson agreed to the price, handed defendant Government funds in this amount, and continued the conversation by making arrangements to meet defendant at a future date to make an additional purchase.

Defendant testified that the only conversation was that regarding the price. "He asked me how much is it and I told him," defendant said. "I told him it was $125.00." Defendant said he counted the money, put it in his pocket, and returned to the avenue near 146th Street where he continued to write numbers.

Both agents testified they did not see Westbook give anything to defendant.

As to how he knew the price, defendant's testimony is that, on the first occasion, when Westbrook asked him to deliver the package, Westbrook told him

---

3. The Government's Trial Memorandum confirms this at p. 3.

a customer was dissatisfied with the quality of other drugs he had been getting through Westbrook and wanted to get something better from another source; that Westbrook told him how much to collect for the package; and also told him he would give him $25.00 for his errand. Defendant insisted Westbrook told him all he had to do for the $25.00 was to take the package around the corner and give it to Robinson who was then waiting in the car.

About an hour and a half after the first sale, defendant testified, he met Westbrook again. Defendant said he was still writing numbers. He testified he gave Westbrook the money and received the twenty-five dollars. None of the agents observed the actions of either Westbrook or defendant later that evening.

Robinson testified Westbrook remained with him for approximately forty-five minutes to an hour driving around the vicinity of 145th Street and Amsterdam Avenue after the first sale. Collins said he and Kofman remained where they had originally parked for about the same period of time keeping surveillance. Robinson dropped Westbrook off at their original meeting place where Westbrook had a car parked.

Sometime after the first sale, Robinson rejoined Collins and Kofman. Collins was not certain whether Westbrook was present at this point. Robinson showed the other agents the envelope received from Dillet which was dated and initialed by Robinson and Collins. The envelope was later weighed and sealed by Robinson. The weight was found to be 3.450 grams. Chemical analyses showed that 3.450 grams of cocaine hydrochloride were in the envelope. Robinson testified a quarter ounce should have weighed 7 grams.

The court finds there was a possibility, because of the inherent inadequacy of the search, that Westbrook had narcotics on his person when he went with agent Robinson to meet defendant. This possibility is bolstered by the fact that the court cannot overlook defendant's testimony that Westbrook was engaged in the sale of drugs.

Further, the court finds, in view of the foregoing possibility, there was an opportunity for Westbrook to surreptitiously give the drugs to defendant while they were, according to both defendant and agent Collins, engaged in conversation just prior to the first sale.

Since there was a possibility that Westbrook, a drug seller, had the narcotics on his person when he met defendant, and since there was an opportunity for transfer, this court cannot say to a moral certainty or beyond a reasonable doubt that the Government has proved that Westbrook did not pass the cocaine here involved to the defendant.

*Second Count:*

The court finds, and it is admitted, that on August 10, 1965, defendant again sold to Robinson approximately 12 grams of cocaine hydrochloride.

On that evening, at about 6 P.M., Westbrook met agents Robinson, Collins and Ritucci on the corner of 125th Street and 3rd Avenue. The meeting likewise had been arranged earlier in the day during a telephone conversation between Robinson and Westbrook.

Westbrook got into the back seat of a Government vehicle with Robinson, while the other agents sat in the front seat. While sitting side by side in the back seat of the automobile, Robinson searched his special employee for narcotics. He found none.

Robinson and Westbrook left the Government vehicle and entered informant's car. There was no testimony that informant's car had been searched. Robinson and Westbrook investigated other cases for about three hours and then drove to the corner of 145th Street and Amsterdam Avenue. Where Robinson and Westbrook went during this three hour period, who they saw, who got out of the car, whether Westbrook was ever alone during this three hour period is not shown. About 9:10 P.M. Robinson and Westbrook parked facing west on 145th Street just beyond the corner of

Amsterdam Avenue. At the same time, Collins and Ritucci parked on the southeast corner of the same intersection.

Defendant testified Westbrook came up to him alone on this second occasion and simply asked him if he was willing to repeat the same errand for the same price and he agreed. He waited a few minutes, he said, before leaving to deliver the package. He also testified the amount received in this transaction was $130.00, not $190.00, the former being the price Westbrook asked him to collect.

Both agents testified they did not see Westbrook give anything to defendant. Defendant admits he had not seen Westbrook at any time earlier that day.

Robinson and Collins testified that Robinson and Westbrook left informant's car together and walked up Amsterdam Avenue towards 146th Street where they met defendant in the vicinity of Singleton's and engaged him in conversation.

Robinson's version of this conversation follows: Robinson told defendant he wanted to purchase a half ounce of cocaine but had only $190.00. On the first occasion, according to Robinson, defendhad advised that one half ounce would cost $200.00. Defendant stated he usually put eight spoons of cocaine in a half ounce package but would give Robinson seven spoons for $190.00. Robinson agreed and defendant instructed him to wait in the car.

Five minutes later, Robinson said, defendant appeared at the passenger side of the car with an envelope containing white powder. He gave defendant $190.00 of Government funds.

Collins testified that on the second occasion after Robinson and Westbrook talked to defendant, defendant "appeared" to enter a hallway next door to Singleton's; a few minutes later defendant walked to the car where agent Robinson and Westbrook were waiting.

Robinson remained with Westbrook in Westbrook's car approximately forty-five minutes to an hour and departed from Westbrook in the vicinity of Riverside Drive and 145th Street, two blocks away.

Collins and Ritucci continued surveillance for about the same period during which time Collins saw defendant standing near the corner of 146th Street. Collins later joined agent Robinson.

Robinson showed the other agents the glassine envelope containing white powder. The envelope was dated, initialed by each agent, and then weighed and sealed by Robinson. He found the weight to be 12 grams. A chemical analysis showed that this envelope contained about 12 grams of cocaine hydrochloride. A half ounce would have been 14 grams.

None of the agents saw either defendant or Westbrook later that night.

The court finds, from the circumstances of the search prior to the second sale, which were similar to those on the first sale, that it was possible for Westbrook to have narcotics cleverly concealed on his person when he went with Robinson to meet defendant.

Unlike the first instance, however, Robinson and Westbrook traveled in the latter's car. There is no testimony that Westbrook's car had been searched for narcotics. Robinson and Westbrook did not go directly to meet defendant. Before they met defendant, Robinson and Westbrook investigated other cases for about three hours. The court finds it is possible that Westbrook's car contained concealed narcotics. It is also possible that at some point during this three hour investigation Westbrook was alone in his car or out of the presence of Robinson.

The court concludes, further, that it was possible for Westbrook to have passed the drugs to defendant because of Westbrook's close proximity to defendant during the course of an obviously close contact conversation, even if in Robinson's presence. The court feels it is reasonable to infer from the illegal nature of the transaction that the parties were in close contact.

Since there was a possibility that Westbrook, a drug seller, had narcotics on his person as in the first instance, and since there was a possibility that Westbrook had narcotics concealed in his car, and

since there was the possibility that Westbrook was alone during a three hour investigation, and since there was an opportunity for Westbrook to clandestinely pass drugs to defendant during a close contact conversation, this court cannot conclude to a moral certainty or beyond a reasonable doubt that the Government proved Westbrook did not pass the drugs to defendant.

In light of the court's findings of fact, on the three crucial disputed issues of fact, the court concludes the Government failed to carry its burden on the whole case by: 1) failing to dispel doubts arising from the calm, forthright testimony of defendant, corroborated, in part, by the testimony of one of the Government's own witnesses, and 2) the state of the record which creates doubts as to the thoroughness of the search of Westbrook and his car, the opportunities which Westbrook had for passing drugs to defendant, and the connection of Westbrook with drugs other than as a narcotics informer.

## Conclusions of Law

The defense is entrapment, a now familiar issue in narcotics cases, although not without its problems.[4] Defendant does not deny having turned over the narcotics and received money in exchange for them. He testified that he did so not only as the result of the inducement of a special Government employee, the usual entrapment claim, but he insists he received the contraband, itself, from the same Government employee. Moreover, the record reads that this special employee was not only himself violating the law but simultaneously aiding the Government in its enforcement of the law in his dual role of narcotics seller and narcotics informer. Defendant's claim is thus not the usual entrapment defense, although not unique in this court. United States v. Silva, 180 F.

Supp. 557 (S.D.N.Y.1959); United States v. Hicks, (unreported opinion of Judge Cooper) 63 Crim. 977 (S.D.N.Y. 1964).

Guiding principles for determining the validity of the defense of entrapment have been enunciated by the Supreme Court in the two leading cases of Sorrels v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) and Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

In *Sorrels* the court said that the "controlling question (is) whether the defendant is a person otherwise innocent whom the government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials".[5] If the Government is merely affording an opportunity for the commission of the offense, there can be no defense of entrapment. It is when "the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute", that the entrapment defense becomes available.[6] In determining whether there has been entrapment, "a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal".[7] Recent cases applying *Sorrels* and *Sherman* have pointed out that where the Government has set in motion or initiated the acts of the defendant, the entrapment defense not only probes the defendant's predisposition but, alternatively, the conduct of the Government in promoting the commission of the crime. United States v. Morrison, 348 F.2d 1003 (2nd Cir. 1965), cert. denied, 382 U.S. 905, 86 S.Ct. 242, 15 L.Ed.2d 158.

Judge Learned Hand in United States v. Sherman, 200 F.2d 880, 882–883 (2nd Cir. 1952) set forth the questions pre-

---

4. United States v. Pugliese, 346 F.2d 861 (2nd Cir. 1965); 74 Yale Law Journal 942 (1965).

5. Sorrels v. United States, 287 U.S. 435, 451, 53 S.Ct. 210, 216 (1932).

6. Id. at 442, 53 S.Ct. at 212–213.

7. Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 821 (1958).

sented when the defense of entrapment is raised:

> "1) Did the agent induce the accused to commit the offense charged in the indictment;
>
> 2) If so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense;

On the first question the accused has the burden; on the second the prosecution has it."

Upon the entire case, the burden of proving guilt beyond a reasonable doubt still is upon the Government. United States v. Silva, 180 F.Supp. 557 (S.D. N.Y.1959); United States v. Hicks, (unreported opinion of Judge Cooper) 63 Crim. 977 (S.D.N.Y.1964). The defendant's burden on the question of inducement is the burden of going forward. United States v. Silva, supra.

Here defendant took the stand and testified that just prior to each sale he received the illegal merchandise from Westbrook, a special Government employee, known to defendant to be a drug seller.

This testimony went to the heart of the Government's burden: " * * * was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense". On this issue, as set forth above in the findings of fact, the court found that the Government failed tho prove beyond a reasonable doubt that the seller-informer did not give the drugs to defendant thereby creating the intent or disposition to commit the offense.

 Defense counsel admits that if defendant had not charged that he got the illegal merchandise from the seller-informer, defendant would not have any entrapment defense because of his ready complaisance. The charge having been made, the burden shifted to the Government to show that defendant did not receive the narcotics from Westbrook, thus proving that the Government did not initiate the sale and that defendant was "awaiting any propitious opportunity to commit the offense".

 Defendant did not have the burden of proving himself innocent beyond a reasonable doubt. This court, too, is bound by the principle that an accused is presumed innocent until the Government proves him guilty beyond a reasonable doubt.

Defendant volunteered that he was engaged in an illegal business. But that infraction of the law was in no way related to the very serious charge made here. Defendant's story might seem implausible, but on reading the cases, United States v. Pugliese, 346 F.2d 861 (2nd Cir. 1965); United States v. Silva, supra; and United States v. Hicks, supra, the court finds that perhaps an atrociously wicked new profession is emerging in the enforcement of our narcotics laws, i. e., the simultaneous seller-informer.

In *Silva* and *Hicks,* the court found that the informer took advantage of the Government in order to preserve his informer status or earn the fee which is paid for every case made while the informer simultaneously deceived the Government as to his own violations of the law.

Defendant testified that he knew Westbrook sold drugs. This testimony was not contradicted. If this court were to apply the alternate test sanctioned in United States v. Morrison, supra, and if the Government were the source of the contraband, it seems clear defendant was entrapped as a matter of law. Certainly, Congress could not have intended and this court has not previously suggested that the narcotics laws may be enforced through professional ultilization of persons who are themselves currently violating the narcotics laws.

It does not appear that the two agents who testified on the trial knew anything about the relationship between defendant and Westbrook or that they knew Westbrook sold drugs. There is nothing in this record to even suggest that if the agents had known the relationship or had known Westbrook sold drugs, they

nevertheless would have used him. But if the alternate test recognized in *Morrison* may be applied, it must be applicable to those cases where the narcotics agents "neither participated in, nor had knowledge of, defendant's betrayal by their paid special employee". United States v. Hicks, supra. It appears that in United States v. Silva, supra, the agents knew or should have known that during the period of the informer's services he had been convicted in a state court on a narcotics charge.

For the reasons set forth in these findings of fact and conclusions of law, this court finds defendant not guilty on both counts.

The defendant made a motion for judgment of acquittal at the end of the Government's case. At that time, defendant had not yet taken the stand and consequently the defense of entrapment had not been made a part of the record. The court reserved decision on that motion until the end of the trial. The court now rules that that motion for judgment of acquittal be and hereby is denied. The motion for judgment of acquittal was renewed at the end of the trial and is now granted.