**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph T. McGRATH, Defendant-
Appellant.**

**No. 71–1791.**

United States Court of Appeals,
Seventh Circuit.

Argued June 12, 1972.

Decided Sept. 26, 1972.

William J. Nellis, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Dan K. Webb, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and FAIRCHILD and STEVENS, Circuit Judges.

SWYGERT, Chief Judge.

This appeal involves the propriety of government practices in supervising the counterfeiting of paper currency, delivering them to the defendant, and sub-

sequently convicting him for their unlawful possession (18 U.S.C. § 474) and for conspiracy to produce and pass counterfeit obligations (18 U.S.C. §§ 471–73). The defendant, who had clearly demonstrated a willingness to counterfeit, nevertheless claims entrapment. The case is a difficult one and prompts our careful reconsideration of the entrapment doctrine.

The Government's proof demonstrated that the defendant, with the assistance of several other persons, embarked upon a scheme to print over one million dollars in counterfeit twenty dollar bills. At some point in the scheme, the Secret Service discovered the plan. Agents then infiltrated the defendant's conspiracy and effectively took direction of it. Prior to this point, the evidence shows that the defendant had purchased rag paper and ink of the type and color necessary to duplicate paper currency and had made inquiries about a printer. There is little dispute, however, that once the agents had infiltrated the ring, they exercised substantial control over its course. Not only did they arrange for and supervise the actual printing of the counterfeit bills, but they also determined how and when they would be delivered to the defendant. An agent, posing as a printer, was to transfer the bogus currency to the defendant's automobile at the rear of a west side Chicago print shop. As soon as the delivery was accomplished, other agents arrested the defendant.

The defendant contends that the Government's activities constituted entrapment as a matter of law. We agree. The defense of entrapment, a relatively new addition to a defense counsel's arsenal, has received limited attention from the Supreme Court. *See generally* Donnelly, Judicial Control of Informants, Spies, Stool Pigeons, and Agent Provocateurs, 60 Yale L.J. 1090, 1099–1115 (1951); Note, Entrapment, 73 Harv.L.Rev. 1333 (1960); Rotenberg, The Police Detection Practice of Encouragement, 49 Va.L. Rev. 871 (1963). In the two major cases dealing with entrapment, Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), and Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), the Court has divided sharply in defining the theoretical basis for the defense, and the relevant standards. Moreover, the Court has never specifically addressed itself to the type of governmental activity charged here.

In *Sorrells*, the Court was faced with the classic case of inducement: A Government agent, masquerading as an old military service friend of the defendant, asked the defendant on several occasions to get him some illegal liquor. The defendant repeatedly refused. Finally, he capitulated and sold the defendant $5.00 worth of liquor. That act resulted in his arrest and conviction which the Supreme Court reversed.

In *Sherman*, the defendant and a Government informer were receiving treatment from the same doctor for narcotics addiction. The informer pretended that the treatment was not succeeding; he feigned suffering in order to persuade the defendant to supply him with narcotics. The defendant did so and was arrested. The Supreme Court again reversed the conviction.

The rationale for the entrapment defense was articulated in great detail in *Sorrells*. Reversal of the conviction was justified as a matter of substantive law; entrapment took the offense outside the scope of the statute. A finding of guilt, the Court reasoned, would be foreign to the purposes of the statute under which the defendant was convicted. Ostensibly, this was the case because an "innocent" had been induced; the criminal design had originated with the Government and had been "implanted" in the mind of the defendant. Accordingly, the test for entrapment focused on the guilty or innocent predisposition of the defendant, "whether the defendant is a person otherwise innocent whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials." 287 U.S. at 451, 53 S.Ct. at 216.

But the opinion is anomalous in some respects. Though discussed in terms of the defendant's complicity, it seems clear that the rationale for the defense rests outside the purview of traditional principles of criminal liability. If the defendant had been induced to commit a crime by the solicitations of a private individual, the defense would not be available. Clearly, the ethical quality of the defendant's act or the resultant harm to society is unaffected by the fact that the soliciting agent was a government official. Rather, the Court is modifying the principles of criminal liability because considerations of fairness—extrinsic to the guilt or innocence of the defendant in a conventional sense—require it. *Sorrells* cited an early federal case, Butts v. United States, 273 F. 35, 38 (8th Cir. 1921), as follows, "The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. . . ." In *Sherman* the Court echoed that sentiment: "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." 356 U.S. at 372, 78 S.Ct. at 820. Judicial interference is fundamentally motivated by concern for supervising the police; the defendant does not merit punishment not because the harm to society is diminished or because he is in some sense less "guilty" but because feelings of decency are offended when society seeks to punish crimes it has instigated. The *Sorrells* Court reasoned that "such an application is so shocking to the sense of justice that it has been urged that it is the duty of the court to stop prosecution in the interest of the Government itself, to protect it from the illegal conduct of its officers and preserve the purity of its courts." 287 U.S. at 446, 53 S.Ct. at 214.

In addition, since *Sorrells* involves principles of statutory construction, it encourages distinctions among statutory offenses that can be based only on con-

siderations of public policy rather than the traditional precepts of criminal law: "The question in each case must be determined by the scope of the law considered in the light of what may fairly be deemed to be its object." 287 U.S. at 451, 53 S.Ct. at 216.

██ The instant case puts the principles enunciated in *Sorrells* and *Sherman* to their severest test. Defining the predisposition test strictly, McGrath's entrapment defense would fail. He was obviously not the innocent, law-abiding citizen led astray by overzealous government agents. He had purchased the kind of paper and ink typically used in counterfeiting. He had made preliminary inquiries about a printer. At the same time, this case fits squarely within the rationale of *Sorrells* and *Sherman,* the basic justifications offered by the Court for modifying criminal liability and the principles of statutory construction they have described. These principles suggest that in counterfeiting cases, predisposition must be broadly defined. Where a complicated criminal scheme is involved, the defendant must have done more than set the initial scheme in motion before his behavior justifies police solicitation. McGrath had not come close to consummating the counterfeiting scheme when the police intervened. Any number of factors—for example, the deterrent effect of other counterfeiting arrests on the defendant or on potential conspirators—could have prompted McGrath's withdrawal. The fact that McGrath did nothing to indicate he wished to withdraw is not sufficient to justify the agents' activities. No more so than in the ordinary inducement situation where the fact that the individual was successfully induced is insufficient to justify overt entrapment. To be sure, our concept of the defendant's responsibilities in each of these situations is tempered by the important responsibilities of the Government to prevent rather than instigate crime. Accordingly, the rationale of *Sorrells,* where the Government apparently engineered the crime, applies equally to a situation where the Govern-

ment itself performs essential parts of a criminal offense that might not otherwise have been committed.

■ In addition, quite apart from the defendant's role, we find the Government's activities in the instant case "shocking to our sense of justice," the same kind of response that led the Court in *Sorrells* to formally recognize the entrapment defense. While *Sherman* and *Sorrells* imply that the offensiveness of police conduct will be measured by the criminality of the defendant, we suggest that in the case before us it is independently determinable. Here the police quite literally "manufactured" the crime. We find it repugnant to the most elemental notions of justice to permit law enforcement personnel to manufacture counterfeit bills, deliver them, and then arrest the recipient for possession of contraband. In United States v. Chisum, 312 F.Supp. 1307 (C.D.Cal.1970), a California district court, confronting a similar situation found entrapment as a matter of law, reasoning that "[w]hen the government supplies the contraband, the receipt of which is illegal, the government cannot be permitted to punish the one receiving it. To permit the government to do so would be to countenance violations of justice." 312 F.Supp. at 1312.

We cannot believe that Congress intended to punish a defendant for possession of counterfeit bills where the defendant took the initial steps leading to the commission of the crime but where the impermissible act itself was performed by the Government. Whatever criminal proclivities the defendant had

were exacerbated by official intervention, a perhaps revocable commitment to crime was then made irrevocable. More significantly, the harm to society derived from the agents' actions rather than from the defendant's.

It is apparent that the facts of this case fit more squarely within the framework articulated in the concurring opinions in *Sorrells* and *Sherman*. The concurring Justices in each opinion take police behavior, rather than the defendant's predisposition, as the linchpin of the entrapment defense. They make no attempt to reconcile entrapment with statutory definitions of guilt. Instead, they root the defense squarely in the court's supervisory power over the administration of justice. The court, according to their view, cannot allow its processes to serve impermissible police conduct.[1] As Mr. Justice Roberts indicated in his concurrence in *Sorrells*, "The doctrine rests, rather, on a fundamental rule of public policy. The protection of its own functions and the preservation of the purity of its own temple belongs only to the court." 287 U.S. at 457, 53 S.Ct. at 218. The concurring Justices in *Sherman*, speaking through Mr. Justice Frankfurter, formulated an alternative test for entrapment; "[w]hether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." 356 U.S. at 382, 78 S.Ct. at 825. Mr. Justice Frankfurter characterizes his test as an "objective" one that "shifts attention from the record and predisposition of the particular defendant to the conduct of the police and the likelihood, objectively con-

---

1. The Model Penal Code supports this posture:

> The defendant whose crime results from an entrapment is neither less reprehensible or dangerous nor more reformable or deterrable than other defendants who are properly convicted. Defendants who are aided, deceived, or persuaded by police officials stand in the same moral position as those who are aided, deceived, or persuaded by other persons. It is the attempt to deter wrongful conduct on the part of the

Government that provides the justification for the defense of entrapment not the innocence of the defendant. Model Penal Code, § 2.10, Comment 1 at 14–15 (Tent.Draft No. 9, 1959).

One author suggests that the real basis is found in the due process clause of the Constitution, *see* Note, The Serpent Beguiled Me and I Did Eat, The Constitutional Status of the Entrapment Defense, 74 Yale L.J. 942 (1965). *See generally* Note, Applying Estoppel Principles in Criminal Cases, 78 Yale L.J. 1046 (1969).

sidered, that it would entrap only those ready and willing to commit crime." 356 U.S. at 384, 78 S.Ct. at 826.

The majority in *Sherman* chose not to reassess the rationale for entrapment that had been advanced in *Sorrells* because these issues had not been argued in the case before it. In Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), a case decided after *Sherman*, entrapment was considered under both approaches. We suggest that cases like the instant one—in which police conduct is improper even though the defendant is not an "unwary innocent"—raise anew the fundamental problems considered by the Court in *Sherman* and *Sorrells*. An approach which focuses on the defendant's predisposition may not be adequate to deal with situations involving solicitation of those with criminal records who may be more amenable to inducement, those involved in minor crimes who by official encouragement move on to major ones, or those, like McGrath, who have embarked on a criminal venture that may never have been completed without official aid. Other courts have reacted similarly when confronted with cases of this genre. The Supreme Court of Illinois, in People v. Strong, 21 Ill.2d 320, 172 N.E.2d 765 (1961), overturned a conviction of selling, dispensing, and possessing narcotics because the narcotics which led to the conviction had been supplied by a Government agent:

> While we are sympathetic to the problems of enforcement agencies in controlling the narcotics traffic, and their use of informers to that end, we cannot condone the action of one acting for the government in supplying the very narcotics that gave rise to the alleged offense. We know of no conviction for sale of narcotics that has been sustained when the narcotics sold were supplied by an agent of the government. This is more than mere inducement. In reality the government is supplying the *sine qua non* of the offense. 21 Ill.2d at 323, 172 N.E.2d at 768.

*See also* United States v. Chisum, *supra*.

■ We find that the defendant's conviction for the possession of counterfeit bills must fail on the grounds of entrapment. The only crime for which the defendant can be charged is conspiracy. Since the Government agents themselves performed the essential elements of the crime, the defendant is only answerable for his criminal acts prior to the agents' intervention. McGrath's acts during this period are sufficient to sustain a conviction for conspiracy to counterfeit.

The judgment is affirmed as to the conspiracy count and reversed as to the substantive offense.[2]

2. Our holding is unaffected by the defendant's additional challenges to his conviction. The defendant complains that the trial court erred in refusing to suppress incriminating sales receipts for the purchase of ink and rag paper found during two warrantless searches of the defendant's vehicle, one at the arrest scene and one shortly afterwards, at the site where the vehicle was impounded. Assuming, *arguendo*, that this argument is valid, we find the error to be "harmless" in the context of the case against McGrath for conspiracy to counterfeit.

McGrath's allegation that his sentence was excessive and disproportionate is equally without merit. Where the sentence is within the prescribed range and no extraordinary circumstances exist compelling our review, this court will not override the district court's discretion over sentencing. Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 76 L.Ed. 306 (1932); Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958); United States v. Willard, 445 F.2d 814, 816 (7th Cir. 1971); United States v. Fallon, 407 F.2d 621, 624 (7th Cir.), cert. denied, 395 U.S. 908, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969). With the substantive count overturned, all that remains is a three-year sentence on the conspiracy count. Under these circumstances, we do not believe review of McGrath's sentence is warranted.