**UNITED STATES of America, Plaintiff,**

v.

**Woodrow W. MAHONEY et al., Defendants.**

**Crim. No. 72–377.**

United States District Court,
E. D. Louisiana.

Feb. 14, 1973.

Stephen L. Dunne, Asst. U. S. Atty., Bernard A. Horton, New Orleans, La., for Woodrow W. Mahoney.

Walter G. Monsour, Jr., Baton Rouge, La., for Oliver P. Brannon.

Milton P. Masinter, New Orleans, La., for James T. Caves.

CASSIBRY, District Judge:

This rather complicated case involves the importation of 118 pounds of marijuana into this country by one Garfield Mortley. This marijuana eventually found its way into the hands of the three defendants in this case, who were charged with possession of narcotics in violation of 21 U.S.C. § 844(a). The case is now before me on the defendants' motion to dismiss on the grounds of entrapment.

## I. FACTUAL BACKGROUND

The factual circumstances surrounding these charges, as developed by the evidentiary hearing I held, are largely undisputed. Briefly, it appears that Garfield Mortley, a merchant seaman, was a regular and large-scale importer of drugs into this country. His chief buyer and distributor here was one Joseph Reed. Through Reed, the defendants Brannon, Caves and Mahoney met and dealt with Mortley in his illicit traffic. The extent of this relationship is in some dispute. The defendant Caves claims to have met Mortley on only one occasion and then rather casually. The defendant Brannon (Casey) admitted to two meetings with Mortley, and apparently the defendant Mahoney accompanied him on both of these occasions. At one, Casey testified that ten pounds of marijuana was purchased at $125 a pound, and on the other, the defendants (including Mahoney and Caves) were short-changed 15 pounds of marijuana in a transaction which they claim led them to break off their relationship with Mortley and Reed. Mortley, on the other hand, testified that he made three deliveries to the defendants prior to the incident giving rise to this motion. He further claimed that he made arrangements for future deliveries to these defendants and that they told him that they would buy all that he could import. These latter assertions the defendants deny. Mortley also testified, however that Joseph Reed was always his intermediary in these transactions; that Reed would

arrange all of his sales and would either meet Mortley's vessel in person when it docked at Gramercy or else arrange for Mortley's transportation up from the port to Reed's residence in Scotlandville, where the deals would be consummated. The defendants would not be waiting at Reed's apartment but would be telephoned after Mortley had arrived with the contraband. While Mortley said that the defendants knew to expect him around June 13, he admits that they did not know the precise time of his arrival and that they could not have reached him in Gramercy, and could not have met him on the occasion giving rise to this litigation had he not initiated contact with them.

Early in the morning of June 13, Mortley arrived in this country with a large shipment of marijuana—about 118 pounds—and was met at the berth of his vessel by Joseph Reed. By this time Customs agents were aware of the activities of the smuggling ring and had staked out Mortley's ship, hoping to intercept him. Reed's car attracted the suspicion of local police officials who attempted to hail the car down. Reed panicked and fled with these officers in pursuit. The automobile was curbed and Mortley and Reed arrested and turned over to Customs officials together with the contraband marijuana.[1] At all subsequent times, the contraband was either in the custody or under the control of Customs inspectors, although it was not logged into the Customs warehouse until after the incidents detailed below.

At the time of their arrest, neither Mortley nor Reed was a government agent or informer; but shortly thereafter Mortley offered to "cooperate" with Customs agents' efforts to ensnare Mortley's purported customers. The smuggler-turned-agent supplied the authorities with a telephone number which he states Brannon and Mahoney gave him as a place where they could be reached. The number was in fact that of a girl friend of one of these defendants. An agent (Petty) placed a call to that number, reaching the defendant Brannon. A conversation ensued, the substance of which was as follows. The agent represented himself as a friend of Mortley's who had been given custody of the latest shipment by Mortley because of some trouble the latter had experienced bringing it into the country. Brannon told him that the last time they'd dealt with Mortley they'd been short-changed 15 pounds and that they'd have to get that squared away before they could do business again. Brannon also said that the defendants did not have the cash necessary to purchase the full amount that Mortley had smuggled in. The agent professed to be unaware of the earlier difficulties the defendants had experienced with Mortley and said he wanted no part of all that trouble. The defendant Brannon replied that everything would "be cool" provided that the previous shortage was cleared up, and the agent responded that he would have Mortley call them in the afternoon to try to make the necessary arrangements.

After this call was completed, the government agent who had made it spoke with Mortley. According to Mortley, Agent Petty instructed him to make the call, but did not leave instructions to make the arrangements for the sale to the defendants. This Mortley allegedly did on his own initiative. Although the substance of Mortley's conversation with the defendants is not a matter of record, it appears undisputed that Mortley made the defendants a generous offer in order to induce them to deal with him. He promised to make up the previous 15 pound shortage and to allow them to acquire the entire balance of the shipment for whatever cash they could raise. In other words, the defendants were per-

---

1. In a companion case to this one, I granted a motion to suppress the 118 pounds of marijuana because the search which uncovered it had been made without a warrant and did not fall within any of the narrow exceptions to the warrant requirement. United States v. Reed, CR No. 72-378 (Sept. 15, 1972).

mitted to purchase this shipment of contraband on credit—an arrangement never before employed.

The testimony of Agents Sibley and Petty—the two Customs officials in charge of this investigation—is substantially similar in this regard. They acknowledge that it was they who decided to "continue the investigation" to embrace these defendants on the basis of information they received from Mortley and that he volunteered to cooperate with them. To this purpose, Mortley was allowed to call the defendants and set up a sale and was permitted to meet them with the narcotics previously seized in order to complete the crime. While in custody and under the control of the agents, Mortley made arrangements to transfer the marijuana to the defendants in New Orleans, at which time they were arrested and eventually charged with possession of the drug.

## II. LEGAL THEORIES OF PLAINTIFF AND DEFENDANTS

This case presents a rare instance of a government agent *selling* rather than *buying* contraband. This is not a standard practice. The government justifies its conduct by arguing that these goods were in effect consigned to the defendants; and that all that the government did here was to allow Mortley to complete the transaction as it was originally intended to occur before the agents arrested Mortley and Reed and seized the marijuana they were carrying. The government claims that they have shown —through their demonstration of a recurrent pattern of dealings between the defendants, Reed and Mortley—that this contraband was intended to reach Brannon, Caves and Mahoney. The government asserts that this same rationale

would be improperly applied were it used to follow this drug shipment through to remote customers, as the amount of crime so generated would be excessive; but here, so the argument goes, nothing more was done than to complete a delivery intended from the outset to occur.

The defendants dispute the government's contention that this marijuana was intended to reach them. They point out that their last transaction with Mortley had resulted in their being short-changed almost $2000 worth of drugs (a fact which is undisputed) and that they did not intend to deal with Mortley and Reed in the future because of this prior bad experience. Thus, the defendants argue, the government's "consignment theory" is defective under the particular facts of this case, irrespective of its validity as a general proposition.

From the evidence presented to me, I find that there is no testimony that anyone but Reed was the conduit through which *all* of Mortley's contraband passed. Even if Mortley's testimony to the effect that the defendants promised to buy all that he could import is believed,[2] nevertheless he identified Reed as the sole domestic distributor of his illicit drugs. The evidence does not suggest, in other words, that the defendants were *in fact* the sole users of all of Mortley's illicit materials irrespective of their *willingness* to be; and after the short-changing of the defendants in which he participated, it seems unlikely that they would have been willing to adhere to any earlier pledge they might have made. The recorded conversation between Casey and Agent Petty, portions of which are set out in the margin,[3] seems to substantiate this. At

2. Apparently as a result of his cooperation in developing the case against the defendants in this action and against Joseph Reed in a companion suit, no charges have ever been brought against Mortley.

3. The following excerpts are taken from a transcription of a recorded telephone conversation made by Special Agent

Donald Petty on June 13, 1972, to a Baton Rouge telephone number supplied by Mortley. ("P." is Agent Petty, and "C" is Casey).

\* \* \* \* \*

C: Hello.
P: Yeh, this is a friend of your boys on the boat that came up there last night. Garfield.

the very least, this episode leaves the government's "consignment" theory open to doubt.[4]

■ But there is a second component to the defendants' position. They claim that the government's conduct in this case amounted to entrapment—not in the traditional sense but in an emerging, supplemental "government misconduct" sense. Briefly put, they argue that the defendants' criminal activity would have been impossible had it not been for the extensive efforts of the government. Once the agents had arrested Mortley and Reed and seized the marijuana they were transporting, all possibility for criminal conduct in respect of that contraband was terminated. However, the government, acting through its by-then-agent Mortley, created additional criminal potentialities by taking this substance which had been effectively withdrawn from circulation and reinjecting it into the market. This, the defendants maintain, is not an option available to the government.

C: This is Casey.
P: Yeah man, I know. I am not Garfield, I am a friend of Garfields, man like, there was a bunch of heat on that deal last night and he got the stuff off down here before he went off up there. He has your load down here. I got it. He wants me to let you know that he wants to do the deal down here. Down here in New Orleans. I am in New Orleans calling, from New Orleans.
C: Oh really?
P: It is at my pad now, so he said the price is going to be the same, but he doesn't want to come up there anymore.
C: Well, did you hear about what happened to us the last time?
P: No man, what happened to you last time?
C: We got shorted 15 L.B.'s. We fucking have to talk to Garfield. Ringo wants to know what's happening and he is going to talk to Garfield and they are going to get it straight this time.
P: Shit man. He didn't put me on to any deal like that.
C: Well, it really put us in a bind, you know what I mean, like that is $2,000 bucks worth of shit.
P: I can dig it man.
C: Like we have to get it straight with him before we can do the next one. Like we got the bread for it and everything.
P: Well, you have the bread for the deal now? That's all he asked me to find out.
C: Yes, but we are not going to do it until we talk to Gar. or someone and get something straight because that just wasn't right that last deal.

4. The government strenuously argues that other portions of the conversation between Agent Petty and "Casey" establish outright that the defendants had in fact previously agreed to accept this shipment.

At the very least, the government urges, this evidence raises a factual question which, under the governing precedents of this circuit, is to be decided by the trier of fact at trial. United States v. Villafana, 455 F.2d 478 (5th Cir. 1972); Pierce v. United States, 414 F.2d 163 (5th Cir. 1969). The critical excerpts in this respect are as follows:

P: Alright, so what do you want? Do you want him to front you some 15 lbs?
C: We have to get that straightened out first and then after that we have cash for everything.
* * * * *
P: Well look, I don't want to get caught in the middle of any God damn hassle between you and Garfield.
C: Well, the thing was between us and Garfield, it was his pot.
* * * * *
P: I will have him call you man. I am going to tell him I want out of the deal if you are going to hassle. I thought this was a smooth [deal]. . . .
C: There is no hassle. You see, everything was cool, but we have just got to get straight on that last thing because it is not settled.
P: I can dig it.
C: We are not trying to start no hassle or nothing.
P: I don't want to get one started either man.
C: O.K. Look, tell Gar. to call.

I do not believe that this conversation conclusively establishes a prior agreement to accept the drugs in question. It is also susceptible to a reading that an earlier satisfactory relationship between the defendants and Mortley had been severed by the short-changing alluded to. However, there is enough evidence on that point to go to the jury, and it would be improper for me to rule on the matter at this time. United States v. Villafana, supra. See Part IV of this opinion.

While they could have chosen not to intercept the contraband and to follow it through to various customers and then to arrest those purchasers for possession and/or sale, it was impermissible to take the substance out of circulation and then restore it to the public domain to generate crimes which were—but for the subsequent governmental action—incapable of commission.[5] The governing standard appears to be whether there was "an intolerable degree of governmental participation in the criminal enterprise." Once such a pattern of activity on the part of the government is shown, a predisposition to commit the crime on the part of the defendant does not defeat the entrapment defense. United States v. McGrath, 468 F.2d 1027 (7th Cir. 1972); United States v. Russell, 459 F.2d 671, 673 (9th Cir. 1972) cert. granted, 409 U.S. 911, 93 S.Ct. 226, 34 L.Ed. 2d 172 (1972).

## III.  LEGAL ANALYSIS

A rather concise summary of the legal issues presented by this case appears in the government's memorandum in opposition to the motion to dismiss:

There are two theories of thought in the Federal Judiciary on the defense of entrapment as a matter of law. The first is the "predisposition" theory. Briefly stated it holds that if one is predisposed to commit a crime, entrapment as a matter of law will not succeed as a defense. United States v. Tatar, 439 F.2d 1300 (9th Cir., 1971).

The second theory has been characterized as the "government [mis] conduct" theory. Briefly stated it holds that no matter how predisposed one is to commit a crime, if the government creates activity constituting the crime, entrapment as a matter of law will succeed as a defense on a motion to dismiss. United States v. Chisum, 312 F.Supp. 1307 (C.D.Cal., 1970).

In this case the defendants rely primarily on the "government misconduct" theory. It does not seem that they can contend in good faith that they were not predisposed to traffic in drugs, given their history of dealings with Reed and Mortley, as well as the size of their purchases. At the very least, such an assertion would raise a factual dispute not amenable to summary disposition. Hence I will discuss their position solely in reference to the so-called "government misconduct" cases.

Almost all of this new line of entrapment cases have arisen in the Ninth Circuit. One of the earliest of these, United States v. Chisum, 312 F.Supp. 1307 (C.D.Cal.1970), involved facts similar to those arising here. In *Chisum*, one Metzger had been charged with dealing in counterfeit money in the Los Angeles area, and the charges against him had received widespread news coverage. The defendant, without solicitation, came unannounced to Metzger and told him he wanted to buy all the counterfeit money Metzger had. Metzger contacted the Secret Service, and, pursuant to instructions from that agency, called the defendant and told him that while he didn't want to get personally involved, he could arrange for his brother-in-law "Larry" to make the sale. Larry was a Secret Service agent. Metzger told defendant that he would set up a meeting between "Larry" and defendant in which the latter could see samples of the counterfeit money offered for sale. This

---

5.  If the government wishes to pursue the consignees of contraband goods as well as the consignor, it is of course free to allow the latter to complete delivery of the illicit articles before arresting him and his confederates. *See* United States v. Johnson, 469 F.2d 973 (5th Cir. 1972); United States v. Canseco, 465 F.2d 383 (5th Cir. 1972); United States v. Quinones-Alvarado, 464 F.2d 12 (5th Cir. 1972). The difficulty in this case is that the government did not follow that procedure, but instead interrupted the unhindered flow of the contraband and then directed it on its way once again, with an impetus no longer due entirely to the unfettered efforts of the original participants to the scheme.

meeting was held, and the price and amount of the bills to be sold was discussed. About a week later, "Larry" contacted the defendant and inquired whether he was still interested in the transaction. Defendant indicated he was and suggested the deal be closed that evening. The purchase by defendant from the agent was consummated and the agent thereafter arrested defendant for receiving counterfeit bills with the intent to pass them as genuine. 312 F. Supp. at 1308–1309.

The court stated unequivocally that the predisposition to commit the crime was in no way induced by the government. After discussing the various theories espoused in opinions and legal literature concerning the defense of entrapment, Judge Ferguson wrote:

> The theme taken by Justice Frankfurter in *Sherman* [v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848], following the reasoning of Justice Roberts in *Sorrells* [v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413], is that entrapment is a defense because "the methods employed on behalf of the Government to bring about conviction cannot be countenanced." . . . Under this view the evidence of a predisposition is irrelevant. The paramount concern is "whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power."

312 F.Supp. at 1310. Significantly, the Fifth Circuit has taken a similar view of the defense of entrapment. See Williamson v. United States, 311 F.2d 441, 445 (5th Cir. 1962), discussed below.

The court in *Chisum* was impressed by the fact that this was one of the rare instances in which "the government [had] furnished the defendant the contraband which constituted the crime" and concluded:

> Were the court to sanction the law enforcement activities committed in this case, it would transform the laws designed to promote the general welfare into a technique aimed at manufacturing disobedience in order to punish, a concept thoroughly repugnant to constitutional principles. *When the government supplies the contraband, the receipt of which is illegal, the government cannot be permitted to punish the one receiving it.* To permit the government to do so would be to countenance violations of justice. As Justice Roberts stated in *Sorrells,* "It is the province of the Court and the Court alone to protect itself and the government from such prostitution of the criminal law." 287 U.S. at 457 [53 S.Ct. 210 at 218] (separate opinion).

The government has attempted to respond to the thrust of *Chisum* by characterizing it as a sort of bastard case, at variance with the settled rule of entrapment in the Ninth Circuit. *See* United States v. Tatar, 439 F.2d 1300 (9th Cir. 1971); United States v. Walton, 411 F. 2d 283, 288 (9th Cir. 1969). *Cf.* Corcoran v. United States, 427 F.2d 16 (9th Cir. 1970); Perez v. United States, 421 F.2d 462 (9th Cir. 1970). Although there is some language, especially in *Tatar,* that would support the government's position that *Chisum* represents a substantial departure from settled law,[6] this does not appear to be the case. For example, the same judge who articulated the standard entrapment rule in *Walton, supra,* recognized the "government misconduct" rationale as a distinct alternative defense to prosecution—one to which the usual prerequisite of no predisposition to commit the crime did not apply— in Greene v. United States, 454 F.2d 783, 786 (9th Cir. 1971). Thus in *Greene,*

---

6. *Tatar* said that the "government conduct" theory was a "minority position" and went on to acknowledge its adoption by the district court in *Chisum.* It did not, however, criticize the theory directly, but instead held that it would not cover the facts of the case before it.

where the government agent got in touch with a recently paroled bootlegger, urged him to reestablish his illicit business, furnished him with the necessary supplies and materials, and acted as his sole customer for almost two and one-half years before rearresting him, the Ninth Circuit ordered the indictment dismissed. The court explained:

> [A]lthough this is not an entrapment case, when the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative. Under these circumstances, the Government's conduct rises to a level of "creative activity" . . . substantially more intense and aggressive than the level of such activity charged against the Government in numerous entrapment cases we have examined.

This recognition of two distinct doctrines warranting dismissal was reaffirmed in United States v. Russell, 459 F.2d 671 (9th Cir. 1972), cert. granted, 409 U.S. 911, 93 S.Ct. 226, 34 L.Ed.2d 172 (1972). There the government supplied to an illicit manufacturer of methamphetamine (speed) a chemical compound which was essential to the manufacture of the drug, and then arrested him for producing it. Stating that it could not fairly distinguish its case from "the very carefully written opinion" of the district court in Chisum, supra, the Ninth Circuit stated:

> While it is true that Russell and his codefendants were supplied with only one ingredient of the illicit drug, that ingredient was as essential to the perpetration of Russell's alleged crimes as was . . . the counterfeit money in Chisum. Russell would have been powerless to "commit" the

charged offenses without the Government's pervasive intervention.

459 F.2d at 673 (Emphasis added).

Thus, in summary, it appears that the "government misconduct" theory is quite viable in the Ninth Circuit and provides a defense irrespective of a predisposition on the part of the defendant to commit the crime.[7] The question remains to what extent this reasoning is consistent with this circuit's pronouncements. In that regard, the leading case is United States v. Bueno, 447 F.2d 903 (5th Cir. 1971). The defendant there was charged with selling narcotics, arising out of the following circumstances. A person in the employ of the government as an informer took the defendant to Mexico where heroin was purchased by the informer. The informer and defendant returned to the United States, the informer being the person who brought the illicit drugs into this country. The informer gave an excuse to defendant why he could not make the prospective sale of heroin to the purchaser and asked defendant to make the sale. Defendant did so. The purchaser was a government agent. The defendant offered no testimony that he was illegally induced to sell the contraband drugs. His defense was that the sale had been the "product of the creative activity" of the government informer. Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

The Fifth Circuit noted that "[b]oth the Agent and the Informer must be treated as acting in concert, each with full knowledge of the actions of the other," whether or not the informer's conduct was at the direction or with the knowledge of the supervising agents. 447 F.2d at 905. Each act of the informer, therefore, had to be attributed to the government. The court stated (447 F.2d at 906):

> The facts of this case clearly fit within the framework of the law in this

---

7. The Seventh Circuit has also expressly recognized the "government misconduct" doctrine in a recent opinion. United States v. McGrath, 468 F.2d 1027 (7th Cir., 1972).

field [the defense of entrapment]. If Defendant is to be believed, the sales of heroin were made through the creative activity of the Government. The Defendant would not have had the heroin to sell if it had not been purchased by the Informer. In fact, this particular heroin would apparently not have been in the United States at all, if it had not been smuggled in by the Informer.

We hold that as a matter of law, if these facts be true, the Defendant cannot be convicted of the Possession, handling and sale of the heroin.

The government attempts to characterize *Bueno* as merely a case where it inadvertently failed to negative the defendant's claim that he was not predisposed to commit the crime, and that if this had been done Bueno would have been convicted. This reading, I believe, is untenable. In *Bueno,* the government made the argument that the jury was free to reject any evidence the defendant might have proffered with regard to his state of mind, so that a finding of entrapment as a matter of law would be inappropriate. The Fifth Circuit replied:

> This line of argument misses the point. The defense of entrapment has undergone much maturation since first announced by the Supreme Court, and both the courts and the legal writers offer varying theories upon which it is based. . . .
>
> \* \* \* \* \* \*
>
> *The evidence of willingness to make the sale, which is common to the usual entrapment defense, is no answer.*

. . . The issue there is not what [the defendant] did, but why he did it, i. e. because of coercion. The issue here is what he did, i. e. taking heroin from one government agent and selling it to another. *The Government's case cannot rest on the mere fact that [the defendant] entered into the . . . plan willingly.*

447 F.2d at 906 (emphasis added).[8] Elsewhere in *Bueno,* the court noted that other circuits had held that entrapment was shown as a matter of law when an informer furnishes goods to a prospective purchaser. While not specifically adopting that position, the Fifth Circuit noted rather ominously that the government had not "attempt-[ed] to deal with . . . [those cases] or with the principle of law for which they were cited by [the defendant]." 447 F.2d at 905.

▮ Finally, in describing the circumstances leading to defendant's arrest, the court noted that:

> The story takes on the element of the government buying heroin from itself, through an intermediary, the defendant, and then charging him with the crime. This greatly exceeds the bounds of reason stated by this court in Williamson v. United States, 311 F.2d 441 (5th Cir. 1962).

The reference to *Williamson* is an indicator of the tenor of the court's thinking in Bueno. In *Williamson* the Fifth Circuit quashed the conviction of a ring of bootleggers obtained on the strength of the testimony of an informer employed on a contingent fee basis for the express purpose of "getting" those particular de-

8. The Fifth Circuit was careful, however, not to foreclose the government from contesting the defendant's version of the operative *facts* on remand. When the government did present such evidence, the trial court held that it was proper to submit such a controversy to the jury for resolution. The decision by the jury in this regard was adverse to the defendant, and his conviction was affirmed on appeal. United States v. Bueno, 470 F.2d 154 (5th Cir. 1972). The basis for this affirmance, however, does not appear to be that the government proved that the defendant was predisposed to commit the crime, but rather that it demonstrated that the *facts* were not as the defendant alleged them to be. The defense of entrapment as a matter of law set out in *Bueno I* is apparently still available in a suitable factual situation. *See* United States v. Rodriguez, 474 F.2d 587 (5th Cir. 1973).

fendants. The opinion of the court there stressed the fact that the informer might have induced the sales in question and that his testimony failed to negative that risk. Noting the possibilities of abuse inherent in such an arrangement, the court reversed the judgment of conviction entered below, saying that it had been obtained by practices too nefarious for the judiciary to sanction. 311 F.2d at 444. In a concurring opinion, Chief Judge Brown explained the court's holding:

> I do not think . . . that this [pattern of conduct on the part of the government] is an aspect of entrapment. Its kinship to entrapment is not that the act of a Government representative induced the commission of a crime. Rather, it is that the means used to "make" the case are essentially revolting to an ordered society.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> What we hold is that, recognized as is the role of informer in the enforcement of criminal laws, there comes a time when enough is more than enough—it is just too much. When that occurs, the law must condemn it as offensive whether the method is refined or crude, subtle or spectacular.

311 F.2d at 445.[9] Thus, in summary, I believe that the law in this circuit would support a ruling recognizing the "government misconduct" theory as a valid defense to a prosecution separate and distinct from the traditional doctrine of entrapment.[10] One final question remains: whether the facts of this case warrant the application of that doctrine.

## IV. APPLICATION OF LAW

As noted earlier, other circuits and numerous state courts have held that the government may not sell contraband and then arrest the buyer for possession and that when they do so "entrapment" is made out as a matter of law.[11] While this circuit does not appear to have resolved this question, *Bueno, supra* can be taken as expressing disapproval of such a practice, and such a ruling might well be made in a suitable case.[12]

The two cases on which the defendants place their strongest reliance, *Bueno* and *Chisum*, both supra, would appear to warrant granting the motion to dismiss in this case, provided the defendant's version of the facts surrounding this transaction is correct. The government contends that *Bueno's* facts were much stronger for dismissal than are the facts here, since there the government both supplied the contraband that the defendant actually sold and

---

9. It is noteworthy that both *Williamson* and *Bueno* are relied on by numerous Ninth Circuit government misconduct cases both as authority for their position and as illustrative of the type of overreaching conduct that they seek to condemn.

10. There are of course many, many Fifth Circuit conventional entrapment cases which require that the defendant not be predisposed to commit the crime before the defense will be good. *See, e. g.*, United States v. Isaac, 466 F.2d 502 (5th Cir. 1972); United States v. Virciglio, 441 F.2d 1295 (5th Cir. 1971); United States v. Villafana, 455 F.2d 478 (5th Cir. 1972); Pierce v. United States, 414 F.2d 163 (5th Cir. 1969). I am of the opinion that those cases would not necessarily stand in the way of a ruling in favor of the defendants here, however, for as the Ninth Circuit has explicitly recognized in its more recent decisions, the government misconduct defense is really distinct from entrapment.

11. *See, c. g.*, United States v. Dillet, 265 F.Supp. 980 (S.D.N.Y.1966); United States v. Silva, 180 F.Supp. 557 (S.D.N.Y.1959); People v. Carmichael, 80 Ill. App.2d 293, 225 N.E.2d 458 (1967); People v. Strong, 21 Ill.2d 320, 172 N.E. 2d 765 (1961); People v. Jones, 73 Ill. App.2d 55, 219 N.E.2d 12 (1966); State v. Boccelli, 105 Ariz. 495, 467 P.2d 740 (1970). *Cf.* United States v. McGrath, 468 F.2d 1027, 12 Crim.L.Rptr. 2072 (7th Cir. 1972); United States v. Chisum, 312 F.Supp. 1307 (C.D.Cal.1970); State v. Sainz, 12 Crim.L.Rptr. 2163 (Nov. 22, 1972). *But see* Brooks v. Georgia, 125 Ga.App. 867, 189 S.E.2d 448 (1972).

12. *But cf.* United States v. Rodriguez, 474 F.2d 587 No. 72–1529 (5th Cir. 1973).

bought it from him, while here Mortley imported the marijuana at a time when he was not working for the government. Thus, the government asserts, I am not presented with the unseemly spectacle of the government selling contraband to itself through a middleman that influenced the Fifth Circuit in *Bueno*. I am not convinced, however, that Mortley's status at the time he imported the drugs is of controlling importance. *Chisum* would seem to refute that contention, for there the counterfeiter who turned informer was not working for the government at the time he manufactured the currency—and indeed not until after the defendant had initiated contact with him—and yet the defense was held to be good. The "government misconduct" defense, then, does not seem to depend on whether the "agent provocateur" was so employed *prior* to the particular transaction giving rise to the criminal charges. It is sufficient, in other words, that Mortley was working for the government *at the time* he set up the sale to these defendants. That is clearly the case.

The situation here, however, is complicated by the fact that the government claims to find within *Chisum* itself an exception covering the case at hand. In describing the limits of his holding, Judge Ferguson stated in *Chisum*:

> This [holding] does not mean that the government, after the discovery of contraband in transit, may not take effective measures to arrest the consignee for possession after it has been delivered. In such cases the government does not supply the contraband.

312 F.Supp. at 1312. The government asserts that where, as here, it is not responsible for the importation of the narcotics substance and seeks only to arrest the consignee of that shipment (and not remote users) its conduct falls within a recognized exception to the "government misconduct" cases. I accept the sound-

ness of this position, but with several reservations.

■ First, it would appear that the immediate consignee of these illicit goods was Joseph Reed and not the defendants Brannon, Caves and Mahoney. Thus under the government's own theory, on the facts of this case it is Reed and not they who should be prosecuted.[13] Hence there will be a heavy burden on the government to show that these defendants were the intended recipients of this contraband, from some point in time *prior* to the government's involvement with it. This will be an essential element of the government's case against these defendants, because I am prepared to hold as a matter of law that entrapment was practiced in this case if Brannon, Caves and Mahoney are not in fact the original "consignees" of this illicit merchandise, irrespective of any criminal predisposition on their part. As this is a somewhat unusual approach to an entrapment case, I shall explain my reasons for so ruling in detail.

There is a significant difference, it seems to me, between the typical contraband-in-transit-through-the-mails case and this situation in regard to who is or is not a "consignee." In the ordinary case, the consignee of the illicit articles is determined by the consignor at a time when the latter is acting of his own free will and would have no occasion to fabricate or falsify the consignee's identity. Thus, for example, if the government discovers hashish in transit addressed to a certain post office box and decides to sit back and see who picks it up, there is little possibility that anyone will eventually be implicated who was not in fact a party to the illegal scheme. This is not the situation, however, where a consignor is arrested while in possession of goods which would, in the ordinary course of events, lead to his imprisonment for a substantial period of time, but who, in return for revealing the identity of his theretofore undisclosed

---

13. *See* notes 2–3, *supra* and accompanying text.

"consignees" and arranging to implicate them, is granted complete immunity from prosecution.[14] The potential for abuse and the inherent untrustworthiness of such a scheme are obvious and need not be belabored. I do not believe that the rationale that sustains the traditional consignee of illicit goods cases should be extended to cover the factual situation presented by this litigation, unless the government can show that these defendants were in fact the intended recipients of this drug shipment. Any less restrictive holding would permit the government to manufacture and then punish crime that would not have occurred except for its intervention, a result repugnant to a free and ordered society.

However, because this circuit is firmly wedded to the rule that factual disputes in entrapment cases are matters for jury consideration, it appears that the proper procedure to follow here with resepct to the crucial question of whether these defendants were the "consignees" of this drug shipment is to allow the issue to go to the jury. In that regard, *compare* United States v. Bueno, 470 F.2d 154, No. 72–1777 (5th Cir., 1972), *with* United States v. Bueno, 447 F.2d 903 (5th Cir. 1971).

I approve of the reasoning of the Ninth Circuit's government misconduct entrapment cases and believe that the decisions of this circuit support a similar result. I am also of the opinion, however, that there is a factual dispute regarding whether this case is of the type condemned by those rulings, which under the precedents of this circuit is to be resolved by a jury, subject to this court's power to direct a verdict at the close of the government's case, F.R. Crim.P. 29. I therefore deny the defendants' motion to dismiss, without prejudice to their right to reurge it at a suitable stage of any trial held in this cause.

14. That is the factual setting presented by this case.