**UNITED STATES of America,
Plaintiff,**

v.

**Burette CHISUM, Defendant.**

**Crim. No. 5079–CD.**

United States District Court,
C. D. California.

April 24, 1970.

Wm. Matthew Byrne, Jr., U. S. Atty., Robert L. Brosio, Asst. U. S. Atty., Chief, Criminal Division, Thomas E. Kotoske, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Carl E. Stewart, Los Angeles, Cal., for defendant.

FERGUSON, District Judge.

This is a case of first impression in federal courts involving the issue of entrapment when the government supplies counterfeit money to a person and then arrests him for receiving it.

The defendant is charged with violating 18 U.S.C. § 473, the indictment stating that on October 30, 1969, he knowingly received 500 counterfeit Federal Reserve Notes, with intent to pass them as genuine. After the government responded to his bill of particulars, the defendant moved to dismiss the indictment and for a judgment in bar on the ground that he was entrapped as a matter of law.

The undisputed facts, as disclosed by the government for the purpose of the motion, reveal that a Paul Metzger had been charged with dealing in counterfeit money in the Los Angeles area, and the charges against him had received widespread coverage by the news media. On October 12, 1969, the defendant, a stranger to Metzger, and without solicitation, came unannounced to Metzger's home. He told Metzger that he had read about Metzger in the newspapers and wanted to buy all the counterfeit money that he had. He gave Metzger his calling card. He stated that he had funds to purchase counterfeit bills and told Metzger to check into his credit rating. He left asking Metzger to call him. Metzger immediately contacted the Secret Service.

Three days later, Metzger called the defendant and told him that he did not want to become personally involved with defendant's proposal, but suggested that the defendant meet with Metzger's brother-in-law, "Larry". "Larry" was in fact a Secret Service Agent.

The next day, Metzger and the defendant met at a restaurant. The defendant again offered to buy all the counterfeit bills that Metzger had, stating that if the transaction were conducted uneventfully there would be others. The defendant told Metzger that he knew how to handle the police, knew their method of operation, and assured Metzger that they would not be discovered. Metzger told the defendant that "Larry" would meet the defendant the following evening to show him samples of the counterfeit money.

The following day, "Larry" and the defendant met. The defendant told "Larry" that he wanted to buy all of Metzger's counterfeit money, and further stated:

1. The defendant was not going to pass the bills himself, but would wholesale them to others.

2. The defendant had done this before and knew what counterfeit bills were worth.

3. The defendant was familiar with the operations of the F.B.I. and the Secret Service, knew their operations and knew how to deal with them.

The defendant and "Larry" discussed the amount of counterfeit bills and the price to be paid for them. "Larry" showed the defendant samples of counterfeit bills, but refused to let the defendant have them. Arrangements were made to meet again.

On October 30, 1969, "Larry" called the defendant. The defendant stated that he had been waiting a week to hear from him and had unsuccessfully tried to contact him on several occasions. "Larry" asked if the defendant was still interested in the transaction, and the defendant replied that he was, suggesting that the transaction be completed that evening. The defendant stated that he wanted the transaction to be accomplished at a place where he could leave quietly and easily. The parking lot of a restaurant was agreed upon.

That night, in the parking lot, "Larry" and the defendant met, the Secret Service Agent bringing with him the counterfeit money alleged in the indictment. "Larry" opened the trunk of his automobile and the defendant took out a box which contained the counterfeit bills. The defendant opened the box, examined the bills and then placed them in

the trunk of his automobile. He was then arrested for receiving counterfeit bills with the intent to pass them as genuine.

The motion to dismiss must be granted, and defendant is entitled to a judgment in bar for the reason that the acts of the government agent in delivering and supplying the counterfeit bills constitute entrapment as a matter of law. An explanation of the court's ruling is not without difficulty, primarily because very few cases reach the type of governmental activity involved here.

There appears to be no mention among English writers on criminal law of entrapment as a defense to a charge of crime. It is an American doctrine, and it does not have a statutory basis in the federal system although many of the states have made entrapment a matter of statutory prescription. The original and current status of entrapment in the federal courts derives from two opinions of the United States Supreme Court, Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), and Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

In *Sorrells*, a government agent posed as an old service friend of the defendant. Playing on this feigned comradeship, the agent repeatedly asked the defendant to get him some illegal liquor; each time the defendant balked. Finally, the defendant sold the agent $5.00 worth of liquor, for which he was later convicted. The Supreme Court reversed, finding entrapment as a matter of law.

In *Sherman*, the defendant and a government informer were patients of the same doctor for treatment of narcotic addiction. The informer feigned suffering so as to play on the defendant's sympathy until the defendant supplied the informer with narcotics. Again, the Supreme Court reversed the conviction finding entrapment as a matter of law.

■ By virtue of these decisions, entrapment is recognized in the federal courts as a defense to prosecution. In *Sorrells*, the Court concluded that the

defense was implicit in congressional intent in enacting the National Prohibition Act. The origin of the defense was thus one of statutory construction. As Chief Justice Hughes states for the majority in *Sorrells, supra*, at 448, 53 S.Ct. at 215:

"We are unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them."

In *Sherman*, Chief Justice Warren endorsed the Hughes view of entrapment, and refused to reassess the majority opinion.

The emphasis in judicial opinions on entrapment defenses, at least in the federal courts, since *Sorrells*, has been on two elements: inducement and predisposition. In order to establish the defense it has been necessary to establish (1) lack of any criminal predisposition in the accused, and (2) governmental activity which reaches beyond the simple acquisition of evidence of a crime.

The Supreme Court last examined the doctrine of entrapment in Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), where the Court affirmed a conviction of attempted bribery. There a government agent went into the defendant's saloon to inquire as to violations of the excise tax laws. The defendant, without any statement from the agent, offered to pay the agent a bribe if the agent would forget the matter.

■ The classic case which gives rise to the defense of entrapment, therefore, is one in which the government agent induces the intent of the defendant to commit the wrong. The typical situation is where the officer, after having reason to suspect that the defendant has been engaged in some illegal activity, e. g., sale of narcotic drugs, approaches the suspect and offers to buy contraband

from him. The suspect, ignorant of the solicitor's official capacity, sells to the officer the illegal drug. The entrapment issue is then a factual one—did the officer induce the requisite criminal intent? Chief Justice Hughes, in *Sorrells*, described entrapment as "when the criminal design originates with the officers of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." 287 U.S. at 442, 53 S.Ct. at 212.

If the defense of entrapment must be confined solely to the issue of intent, then the defendant's motion must fail. It is clear that the facts as presented here reveal that the intent to commit the crime arose solely in the mind of the defendant without inducement by the government. The intent to illegally possess counterfeit money was his own creation.

There does not appear to be any single, well-recognized and consistent rationale for the entrapment defense. Reasons frequently advanced in support include (1) estoppel where there is evidence of governmental misconduct [Casey v. United States, 276 U.S. 413, 425, 48 S.Ct. 373, 72 L.Ed. 632 (1928) (Justice Brandeis dissenting)]; (2) constitutional concepts of due process [Raley v. Ohio, 360 U.S. 423, 79 S.Ct. 1257, 3 L. Ed.2d 1344 (1959), Note, Due Process and the Entrapment Defense, 1964 U. Ill. L. Forum 821, and Comment, The Serpent Beguiled Me and I Did Eat— The Constitutional Status of the Entrapment Defense, 74 YALE L. J. 942 (1965)]; (3) the innocence theory [*Sorrells, supra* and *Sherman, supra*]; (4) public policy [Ritter v. United States, 293 F. 187 (9th Cir. 1923)]; and (5) preservation of the integrity of the judicial processes [*Sorrells, supra* (Justice Roberts concurring), and *Sherman, supra* (Justice Frankfurter concurring)].

In both *Sorrels*, and in *Sherman*, the Supreme Court was "sharply divided" [*Lopez, supra* 373 U.S. at 434, 83 S.Ct. 1381] over an acceptable foundation for a claim of entrapment. The majority in both cases stressed the innocence theory, *i. e.*, the presence or lack of a predisposition by the accused to violate the law. The minority opinions in both cases emphasized the presence or lack of police misconduct.

The theme taken by Justice Frankfurter in *Sherman*, following the reason of Justice Roberts in *Sorrells*, is that entrapment is a defense because "the methods employed on behalf of the Government to bring about conviction cannot be countenanced". 356 U.S. at 380, 78 S.Ct. at 824. Under this view the evidence of a predisposition is irrelevant. The paramount concern is "whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power". 356 U.S. at 382, 78 S.Ct. at 825.

In *Lopez, supra*, 373 U.S. at 434, 83 S.Ct. at 1385, Justice Harlan emphasized that it is "the *manufacturing* of crime by law enforcement officials and their agents" which is of primary concern.

In Raley v. Ohio, the entire Court, Justice Stewart not voting, concluded that entrapment violates the Due Process Clause. Four Justices determined that factually entrapment existed, and four determined that it did not. The latter four held, "In this posture of the facts there could be no entrapment and hence no lack of due process". 360 U.S. at 445, 79 S.Ct. at 1270. Justice Brennan, for the four finding entrapment as a matter of fact, stated, "We cannot hold that the Due Process Clause permits convictions to be obtained under such circumstances. 360 U.S. at 439, 79 S.Ct. at 1267.

The research of the court has found only a few cases where the facts were similar to those here—that is, the government furnished the defendant the contraband which constituted the crime.

The first is Scott v. Commonwealth, 303 Ky. 353, 197 S.W.2d 774 (1946). There the defendant was arrested for unlawful possession of liquor. Prior to trial the City Attorney informed the

Chief of Police that the warrantless search which led to the arrest was illegal and instructed the Chief to return the liquor to the defendant. The Chief did, and the defendant took it back into his house. The Chief then obtained a search warrant and the liquor was again seized. The defendant was convicted for possessing the liquor illegally for purpose of sale. The Kentucky Court of Appeals reversed, holding that entrapment existed as a matter of law. The court reasoned that:

"It seems to be the general rule, and the courts are agreed, that the criminality of the act depends on whether the criminal intent originated in the mind of the accused or originated in the mind of the entrapping person. Where it originates in the mind of the accused, the fact that the opportunity is furnished constitutes no defense. The real test seems to be that he must participate in all the acts necessary to constitute the crime, and unless he does, he should not be convicted. See Annotated Cases, 18 A.L.R. 146. This liquor had been previously taken illegally, that is, without search warrant. In order for Scott to get it back into his possession there must have been some act upon the part of the officer, no part of which the accused could participate in. To say that the accused and the officer acted together in initiating the act would be making the officer a party to a criminal act and thereby, charging him with criminal responsibility. The officer in no way had such thing in mind. It does appear, however, that he did have in mind the obtaining of evidence for the purpose of prosecution, and the evidence he was seeking was the liquor, which he himself, under direction of his superiors, placed in the hands of the accused." 303 Ky. at 354, 197 S. W.2d at 775.

*Scott* may be explained on the basis that the second search with the warrant was the "fruit of the poisoned tree" of the first illegal search. See Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). It may be explained by the reasoning of Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), the defendant, in *Scott*, being misled by the police to believe that possession of the liquor was not illegal when they openly returned it to him.

The Supreme Court of Illinois, in People v. Strong, 21 Ill.2d 320, 172 N.E.2d 765 (1961), held that a defendant who was convicted of selling, dispensing and possessing narcotics was entrapped as a matter of law when the narcotics which were the basis of the convictions were supplied to him by a government agent. The court held:

"While we are sympathetic to the problems of enforcement agencies in controlling the narcotics traffic, and their use of informers to that end, we cannot condone the action of one acting for the government in supplying the very narcotics that gave rise to the alleged offense. We know of no conviction for sale of narcotics that has been sustained when the narcotics sold were supplied by an agent of the government. This is more than mere inducement. In reality the government is supplying the *sine qua non* of the offense." 21 Ill.2d at 323, 172 N. E.2d at 768.

Although *Sherman* was a case involving intent, Chief Justice Warren stated, "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." 356 U.S. at 372, 78 S.Ct. at 820. And Justice Frankfurter, in his concurring opinion, stated, "The crucial question, not easy of answer, to which the court must direct itself is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power. For answer it is wholly irrelevant to ask if the 'intention' to commit the crime originated with the defendant or governmental officers, or if the criminal conduct was the product of 'the creative activity' of law-

enforcement officials." 356 U.S. at 382, 78 S.Ct. at 825.

 Entrapment is indistinguishable from other law enforcement practices which the courts have held to violate due process. Entrapment is an affront to the basic concepts of justice. Where it exists, law enforcement techniques become contrary to the established law of the land as an impairment to due process. For some law enforcement conduct, as stated by Judge Brown, concurring specially in Williamson v. United States, 311 F.2d 441, 445 (5th Cir. 1962), "* * * there comes a time when enough is more than enough—it is just too much. When that occurs, the law must condemn it as offensive whether the method used is refined or crude, subtle or spectacular." Less than this the courts cannot approve.

 Were the courts to sanction the law enforcement activities committed in this case, it would transform the laws designed to promote the general welfare into a technique aimed at manufacturing disobedience in order to punish, a concept thoroughly repugnant to constitutional principles. When the government supplies the contraband, the receipt of which is illegal, the government cannot be permitted to punish the one receiving it. To permit the government to do so would be to countenance violations of justice. As Justice Roberts stated in *Sorrells*, "It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law." 287 U.S. at 457, 53 S.Ct. at 218 (separate opinion).

 This does not mean that the government, after the discovery of contraband in transit, may not take effective measures to arrest the consignee for possession after it has been delivered. In such cases the government does not supply the contraband. It does not mean that the postal authorities may not use decoy letters to apprehend postal thieves. In such cases the government does not deliver the letter into the possession of the thief. If it is an offense against the laws of the United States to attempt to receive counterfeit bills, then the government may proceed against the defendant for that offense. See Lopez v. United States, *supra*. But to permit the government to proceed against the defendant based on the present indictment would be to allow the manufacture of crime by the government and to permit the government to violate the Due Process Clause.

The indictment in this proceeding is dismissed.

 This judgment is a judgment sustaining a motion in bar within the provisions of 18 U.S.C. § 3731, the defendant not having been put in jeopardy. See United States v. Covington, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969).

It is further ordered that the clerk this date shall serve copies of this judgment by United States mail upon the attorneys for the parties appearing in this action.