No. 65,870

STATE OF KANSAS, *Appellant,* v. BRYAN E. NELSON, *Appellee.*

(822 P.2d 53)

Opinion filed December 6, 1991.

*Debra A. Vermillion,* assistant district attorney, argued the cause, and *Paul J. Morrison,* district attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellant.

*J. Lawrence Louk,* of Fox & Partee, of Prairie Village, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This first impression criminal case relates to a claim of outrageous police conduct rising to the level of a due process violation of the 5th Amendment. The trial court found the conduct of the police to be egregious, outrageous, and "entrapment per se" and dismissed the complaint.

The State appeals. Our jurisdiction is under K.S.A. 22-3602(b)(1).

Bryan E. Nelson was charged with possession of cocaine in violation of K.S.A. 1990 Supp. 65-4127a.

In our view, the police conduct was not outrageous, egregious, or entrapment per se. The conduct stopped far short of constituting a denial of fundamental fairness, shocking to the universal sense of justice, in violation of the due process clause of the 5th Amendment. The defense of outrageous police conduct as a denial of due process was misapplied and the complaint should not have been dismissed. We reverse the trial court and remand the case for reinstatement of the complaint.

## Facts

Nelson telephoned Penny J. Boettcher for the purpose of purchasing an "eight-ball" of cocaine. Nelson and Boettcher agreed to meet the next morning at a restaurant. Nelson gave Boettcher $300 at the scheduled meeting. The two decided to meet again that afternoon so that Boettcher could deliver the cocaine.

Prior to the initial meeting with Nelson, Boettcher met with Frank Ogeda and Doug Hanson. Ogeda was Boettcher's apartment manager. (Nelson claims Ogeda was a police informant.)

Hanson was a prospective cocaine buyer and an undercover narcotics policeman. Ogeda introduced Hanson to Boettcher. Neither Boettcher nor Ogeda knew of Hanson's undercover activity.

Hanson asked Boettcher if she would sell him a quarter gram of cocaine. Boettcher agreed to provide Ogeda with the cocaine Hanson wanted.

Hanson learned that Boettcher was to meet an attorney (Nelson) that day to receive payment for cocaine. Hanson was present when Boettcher secured cocaine for Nelson and himself. The information on Boettcher's purchase and planned resale was passed on to other law enforcement officers.

Boettcher was running late for her afternoon meeting with Nelson. She telephoned Nelson's office and left a message that she would meet him at 7:00 p.m.

When Boettcher arrived to meet Nelson that evening, he was not there. Boettcher called a mutual acquaintance, Dave Slater, to find out how to contact Nelson. Slater did not answer his phone, and Boettcher left a message on his tape recorder. After the phone call, Boettcher returned to her apartment.

Boettcher was stopped by law enforcement officers on the way to her apartment. She was arrested for the sale of cocaine to Hanson. Police removed the cocaine she was to deliver to Nelson from her purse. After her arrest, Boettcher was transported to the Johnson County Sheriff's Department.

Boettcher told police that she was to meet Nelson at 7:00 p.m. that evening to deliver an "eight-ball" of cocaine. Boettcher said she was late and, apparently, Nelson had left before she arrived. Boettcher agreed to finish her prearranged cocaine delivery to Nelson.

Boettcher and Nelson decided, through Slater, to meet later the same evening at a restaurant.

Boettcher, in the company of Detective Michael Kill, drove to the restaurant. Kill placed the cocaine originally taken from Boettcher and a tape recorder in Boettcher's purse. Nelson was waiting for Boettcher at the restaurant parking lot when she and Kill arrived. Kill told Boettcher to do what she normally would do when she met with Nelson. Boettcher walked over to Nelson's car. Once she was in the car, Nelson held out his hand and

Boettcher dropped the "eight-ball" of cocaine in his hand. After a short conversation, she walked back to her car.

Nelson attempted to leave the area but was stopped by police. The "eight-ball" of cocaine was found in an air vent next to the base of the console in his car. During the search, police also recovered two vials which contained powder residue. The powder residue in one vial was later determined to be cocaine. The other vial contained an insufficient amount of residue to test.

Boettcher first met with Nelson at Slater's house six months before Nelson's arrest. The purpose of the meeting was to discuss the sale of cocaine from Boettcher to Nelson.

Kill, who had Boettcher under surveillance, observed the initial noon meeting between Nelson and Boettcher the day of Nelson's arrest. When Boettcher told Hanson of her planned sale to Nelson, Hanson informed law enforcement officers. Law enforcement officers already had Nelson's name due to Kill's prior observance. Police surveillance of Nelson's residence commenced at 6:00 p.m. the night of his arrest.

The record reflects a dispute as to the packaging of the cocaine. Boettcher said that the cocaine had been repackaged when it was returned to her to deliver to Nelson. Kill stated that it was packaged exactly as he had received it from Boettcher.

### Outrageous Conduct

The trial court ruled that the conduct by police in this case was so egregious and outrageous that it constituted a denial of fundamental fairness, shocking to the universal sense of justice, in violation of the due process clause of the 5th Amendment. See *United States v. Russell*, 411 U.S. 423, 432, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973).

Dismissal of a complaint based upon the due process grounds of outrageous government conduct is subject to review de novo as a question of law. *United States v. Bogart*, 783 F.2d 1428, 1431 (9th Cir. 1986). See *U.S. v. Simpson*, 813 F.2d 1462, 1470-71 (9th Cir.), *cert. denied* 484 U.S. 898 (1987); Annot., 97 A.L.R. Fed. 273, 285.

The foundation for the defense of "outrageous conduct" is an offshoot of entrapment and is found in Justice Rehnquist's dictum in *United States v. Russell*: "[W]e may some day be presented

with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." 411 U.S. at 431-32.

In *Russell,* an undercover narcotics agent went to Russell's home and met with Russell and two other people. The agent's role was to locate a laboratory where it was believed that methamphetamine was being manufactured. The agent told Russell that he represented an organization that was interested in controlling the manufacture and distribution of methamphetamine. The agent made an offer to supply Russell with a chemical necessary for the manufacture of methamphetamine in return for one-half of the drugs produced. This offer was made with the condition that the agent be shown where the laboratory was. During the agent's contact with Russell and the other two individuals involved, the agent found out that they had been manufacturing the drug. He was also given a quantity of methamphetamine by one of the individuals. Shortly after the initial meeting, the agent was allowed to view the laboratory. At the laboratory, the agent observed an empty box of the same chemical he had agreed to provide to Russell. 411 U.S. at 425.

The agent provided Russell the promised chemical necessary to manufacture the methamphetamine. As agreed, the agent was given one-half of the manufactured drugs. Russell kept the remainder. 411 U.S. at 426.

About a month after the incident, the agent made contact with Russell and others involved, inquiring if they were still interested in the "business arrangement." He was told by one of the individuals that they were interested but that they had recently obtained two additional bottles of the chemical that the agent previously had provided them. The agent obtained a search warrant for the residence. Evidence of methamphetamine production was confiscated. 411 U.S. at 426.

Russell was convicted of three counts of having unlawfully manufactured and possessed methamphetamine and of having unlawfully sold and delivered that drug in violation of federal statutes. On appeal, the conviction was reversed solely for the reason that an undercover agent supplied an essential chemical for manufacturing the methamphetamine which formed the basis for Russell's

conviction. The Ninth Circuit had concluded that as a matter of law " 'a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise.' " 411 U.S. at 424 (quoting *United States v. Russell,* 459 F.2d 671, 673 [9th Cir. 1972]). The United States Supreme Court reversed the Ninth Circuit.

The Supreme Court held in *Russell* that the law enforcement conduct stopped "far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." 411 U.S. at 432. In doing so, the *Russell* court noted that "in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation." 411 U.S. at 432.

The issue of "outrageous conduct" as a violation of due process was also addressed in *Hampton v. United States,* 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646 (1976). Hampton was convicted of two counts of distributing heroin. Hampton became acquainted with a government informant. During a conversation between the two, Hampton told the informant that Hampton needed money and knew where to get some heroin. The informant told Hampton that buyers could be found. Later, the informant contacted DEA agents. On two different occasions, Hampton, in the company of the government informant, sold heroin to the DEA agents. Hampton's story differed. He testified that the informant had supplied him with simulated heroin which Hampton did not intend to sell. 425 U.S. at 485-87.

The United States Supreme Court once again rejected a due process claim. 425 U.S. at 490-91. In doing so, the Court reaffirmed the entrapment rules of *Sherman v. United States,* 356 U.S. 369, 2 L. Ed. 2d 848, 78 S. Ct. 819 (1958), and *Sorrells v. United States,* 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210 (1932). A defendant who is predisposed to commit a crime cannot claim entrapment. The Court in *Hampton* observed that where predisposition exists, the defense of denial of due process by abusive governmental conduct is also unavailable. 425 U.S. at 488-91. See Annot., 97 A.L.R. Fed. at 279.

Although the due process defense is referred to in *Hampton,* the defense was not applied. The defense has been applied on occasion by lower federal courts. See Annot., 97 A.L.R. Fed. at 279.

The application of the due process defense as a basis for dismissing Nelson's complaint is presented to us as one of first impression.

We note that the Tenth Circuit first considered the defense in *United States v. Gentry,* 642 F.2d 385 (10th Cir. 1981). Gentry was convicted in Kansas of conspiracy to possess with intent to distribute methamphetamine sulfate. He claimed the conduct of DEA agents was so outrageous that it violated his rights of due process, citing *United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978). 642 F.2d at 387-88.

Gentry and others were engaged in an ongoing business to manufacture and sell methamphetamine sulfate. Gentry was introduced to DEA agents through a government informant who had previously purchased methamphetamine sulfate from Gentry. During the next several months there were many conversations and contacts between Gentry and the informant and a DEA agent. On at least one occasion, the DEA agent furnished Gentry with a chemical necessary for the manufacture of methamphetamine sulfate and on another occasion Gentry ordered chemicals and equipment from a storefront operation run by DEA. DEA agents delivered the equipment to Gentry and even offered technical advice. 642 F.2d at 386-87.

In rejecting the due process defense, the Tenth Circuit held that Gentry was involved in an existing drug manufacturing operation prior to the investigation and participation of government agents. 642 F.2d at 387-88. See *United States v. Rivera,* 778 F.2d 591, 598 (10th Cir. 1985), *cert. denied* 475 U.S. 1068 (1986); *United States v. Warren,* 747 F.2d 1339, 1343 (10th Cir. 1984); and Annot., 97 A.L.R. Fed. at 288-93.

During oral argument before this court, counsel for Nelson was asked to cite his "best cases." Counsel responded with *United States v. Bogart,* 783 F.2d 1428, and *U.S. v. Gardner,* 658 F. Supp. 1573 (W.D. Pa. 1987). The *Bogart* court recognized the claim of outrageous governmental conduct as a particularly fact-oriented area of the law and remanded the case for findings of

fact on the nature of, and motivation for, the government's conduct. 783 F.2d at 1438. Compared to the government involvement in *Bogart* and *Gardner,* the police work in the case at bar represents an example of competent professional law enforcement.

*United States v. Brown,* 635 F.2d 1207 (6th Cir. 1980), sets out four factors to consider in determining whether government conduct is so outrageous as to violate due process. The factors are: (1) the type of activity under investigation; (2) whether the government instigates the criminal activity in question or whether it infiltrates a preexisting criminal enterprise; (3) whether the government directs or controls the activities or merely acquiesces in their criminality; and (4) the causal relationship between the challenged government conduct and the commission of the acts for which defendant stands convicted. 635 F.2d at 1213.

The *Brown* court began its analysis by announcing the uniformly accepted rule that "the use of . . . informants to infiltrate criminal enterprises is a 'recognized and permissible means of investigation.' [Citations omitted.] This proposition remains true even though the informant or government agent engages in some criminal activity or supplies something of value to the criminal enterprise." 635 F.2d at 1212-13.

Although the type of activity under investigation in *Brown* involved an interstate burglary ring, the *Brown* court recognized that the use of informants is especially necessary in the investigation of drug-related offenses. 635 F.2d at 1213.

" '[C]ontraband offenses . . . are [especially] difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic. . . . Enforcement officials must be allowed flexibility adequate to counter effectively such criminal activity.' " *Brown,* 635 F.2d at 1213 (quoting *Hampton,* 425 U.S. at 495 n.7 [Powell, J., concurring]).

Without the use of Boettcher as an informant, the police in the case at bar would not have been able to detect the criminal activity in which Nelson was actively involved.

There is no showing that the government instigated any criminal activity. The "cocaine deal" was fully operative when Boettcher was arrested. After her arrest, Boettcher's participation was in finishing the preconceived plan she and Nelson had con-

cocted for delivery of the cocaine. The government *did not* instigate any of the activity nor direct or control the criminal activity in question.

In the case at bar, police were presented with information that Nelson was involved in an illegal drug transaction. In order to apprehend all involved in this criminal activity, Boettcher was allowed to consummate her prearranged cocaine deal with Nelson.

We hold, based on the application of the *Brown* factors to the facts of this case, the defense of denial of due process by outrageous police conduct is unavailable. The record demonstrates an abundance of evidence of Nelson's predisposition to possess cocaine and of his willing participation in the criminal act for which he was charged.

Nelson is not entitled to the defense of outrageous government conduct.

## Entrapment Per Se

Counsel for Nelson, during argument before the trial court on the motion to dismiss the complaint, stated: "Now for purposes of this motion, Your Honor, we are not alleging entrapment, as I believe the Court is aware. We are alleging government misconduct based upon a violation of the Due Process Clause of the Fifth Amendment."

In dismissing Nelson's complaint, the trial court announced the alternative theory that the conduct of the police was entrapment per se.

We have recognized that the defense of entrapment is not available when a predisposition for commission of the crime is shown and the opportunity to consummate the crime is afforded by law enforcement officers. *State v. Jordan,* 220 Kan. 110, 116, 551 P.2d 773 (1976); K.S.A. 21-3210.

Nelson's predisposition is undisputed. The complaint should not have been dismissed.

Reversed and remanded.