No. 68,816

STATE OF KANSAS, *Appellee,* v. GLORIA L. VAN WINKLE, *Appellant.*

(864 P.2d 729)

Opinion filed December 10, 1993.

*Thomas Jacquinot,* special appellate defender, of Lawrence, argued the cause, and *Monica Guerrero,* student intern, and *Steven R. Zinn,* deputy appellate defender, of Topeka, were with him on the brief for appellant.

*Thomas P. Alongi,* assistant county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals her conviction of possession of cocaine, K.S.A. 65-4127a, claiming (1) the conduct of the police was so outrageous that it constituted a violation of due process and (2) there was insufficient evidence to convict.

We recently recognized that law enforcement conduct may be so outrageous as to violate the Due Process Clause. *State v. Nelson*, 249 Kan. 689, 822 P.2d 53 (1991). If the conduct of government agents is not outrageous, the defense of entrapment may be available. Because of the length of the facts and their application to the defense of outrageous conduct of government officials, we will first review the defense.

## OUTRAGEOUS GOVERNMENT CONDUCT

The defense of outrageous government conduct is an offshoot of entrapment. *Nelson*, 249 Kan. at 692. Entrapment has a long history in Kansas, first in common law, and then under the statute adopted in 1970. *State v. Rogers*, 234 Kan. 629, 632, 675 P.2d 71 (1984). The statute, K.S.A. 21-3210, provides:

"Entrapment. A person is not guilty of a crime if his criminal conduct was induced or solicited by a public officer or his agent for the purposes of obtaining evidence to prosecute such person, unless:

(a) The public officer or his agent merely afforded an opportunity or facility for committing the crime in furtherance of a criminal purpose originated by such person or a coconspirator; or

(b) The crime was of a type which is likely to occur and recur in the course of such person's business, and the public officer or his agent in doing the inducing or soliciting did not mislead such person into believing his conduct to be lawful."

The defense of entrapment arises when a law enforcement officer, or someone acting on the officer's behalf, generates in the mind of a person who is innocent of any criminal purpose the original intent or idea to commit a crime which the person had not contemplated and would not have committed but for the inducement of the law officer. A defendant can rely on the defense of entrapment when the defendant is induced to commit a crime which the defendant had no previous intention of committing, but the defendant cannot rely on the defense or obtain an instruction on entrapment when the evidence establishes that the

defendant had a previous intention of committing the crime and was merely afforded an opportunity by a law officer to complete it. *State v. Jordan*, 220 Kan. 110, Syl. ¶¶ 7, 8, 551 P.2d 773 (1976).

In *United States v. Russell*, 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637 (1973), the United States Supreme Court discussed the law of entrapment and a new defense founded upon an intolerable degree of governmental participation in the criminal enterprise, *i.e.*, outrageous government conduct. Russell was convicted in the United States District Court of the unlawful manufacture and sale of methamphetamine. Russell's defense was that he was entrapped into committing the offenses by government undercover agents who supplied him the essential ingredient to manufacture methamphetamine. On appeal, the United States Court of Appeals for the Ninth Circuit reversed the conviction for the reason that the government had supplied an essential chemical for manufacturing the drug. 459 F.2d 671 (9th Cir. 1972). The Ninth Circuit concluded that as a matter of law "a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise." 459 F.2d at 673. The United States Supreme Court granted *certiorari*.

The Supreme Court noted that the Ninth Circuit had in effect expanded the traditional notion of entrapment, which focuses on the predisposition of the defendant, to mandate dismissal of a criminal prosecution whenever the court determines that there has been "an intolerable degree of governmental participation in the criminal enterprise." The Ninth Circuit had decided that the conduct of the agent in supplying a scarce ingredient essential for the manufacture of a controlled substance established that defense. The Supreme Court observed that this new defense was held to rest on either of two alternative theories. One theory is based on two lower court decisions which had found entrapment, regardless of predisposition, whenever the government supplies contraband to the defendants. *United States v. Bueno*, 447 F.2d 903 (5th Cir. 1971); *United States v. Chisum*, 312 F. Supp. 1307 (C.D. Cal. 1970). The second theory, a non-entrapment rationale, is based on a Ninth Circuit decision that reversed a conviction because a government investigator was so enmeshed in the crim-

inal activity that the prosecution of the defendants was held to be repugnant to the American criminal justice system. *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971). The Supreme Court noted that the Ninth Circuit held that these two rationales constitute the same defense, and that only the label distinguishes them. In any event, the Ninth Circuit held that "[b]oth theories are premised on fundamental concepts of due process and evince the reluctance of the judiciary to countenance 'overzealous law enforcement.'" 459 F.2d at 674 (quoting *Sherman v. United States*, 356 U.S. 369, 381, 2 L. Ed. 2d 848, 78 S. Ct. 819 [1958]).

In *Nelson*, we held that a defense to a criminal charge may be founded upon an intolerable degree of governmental participation in the criminal enterprise. We also stated that governmental participation in a criminal enterprise reaches an intolerable degree when it constitutes a denial of fundamental fairness, shocking to the universal sense of justice, in violation of the Due Process Clause of the 5th Amendment of the United States Constitution. *State v. Nelson*, 249 Kan. 689, Syl. ¶¶ 2, 3.

## THE FACTS

There were two versions of the events presented at trial. The State's witness, Rick Crowell, who was on parole for a theft conviction, was approached regarding a marijuana deal. Crowell then called the Crimestoppers phone number and agreed to supply information to the police. Crowell testified he had been working for the Junction City Police Department as a paid confidential informant for about three months. Detective Jackson supervised Crowell. Without giving specific details, Jackson opined that Crowell was a reliable informant.

Crowell had been living at the Rambler Motel about one month when Gloria Van Winkle moved into the motel. Crowell met Van Winkle the day she moved in and saw her frequently between the week she moved in and the date of her arrest. Crowell observed her smoke cocaine on a daily basis and would go with her when she would purchase it. When Crowell told Van Winkle he had dealt drugs in Texas, she expressed an interest in dealing drugs in Junction City.

Crowell called the police department and told them Van Winkle wanted to buy cocaine. This was the first time Crowell had men-

tioned Van Winkle's name to the police. Officer Story testified that through other informants, whom he was unable to name, the police had been told Van Winkle was using drugs. Story knew Van Winkle and knew that she had previous drug-related convictions. The police were interested in Van Winkle because she was a repeat offender and they believed she was connected with major drug dealers.

Story told Crowell to offer to sell Van Winkle an ounce of cocaine for $1,200. When Crowell offered to sell her the ounce of cocaine, Van Winkle told Crowell she could only afford $1/16$ ounce for $150. The deal was set for 9:00 p.m. that day. Detective Homman, operating undercover, acted as a drug dealer that Crowell knew from Texas who was in town with cocaine to sell.

Van Winkle drove Crowell to meet Homman. Crowell introduced Van Winkle to Homman and Homman said, "I heard you're looking for party supplies." After Van Winkle explained she only had $44 of the purchase price, Homman agreed to spot her $6, and to forego the remaining hundred dollars in exchange for a tattoo Crowell had done for a friend of Homman's. Homman showed Van Winkle the cocaine. She said it looked like cocaine she had seen earlier in the week in Junction City. Van Winkle mentioned she knew someone who could deal in larger amounts of cocaine. Van Winkle stated to Homman she had previously dealt cocaine in Wichita and if she had been given more notice, she could have set up other drug deals with Homman. Van Winkle placed the purchase money on the bed. Crowell picked it up and handed it to Homman. Crowell then picked up the cocaine and handed it to Van Winkle. Crowell and Van Winkle left.

After the deal had been consummated, Story gave the signal for the arrest of the defendant. As the officers approached Van Winkle in the hallway, she threw the cocaine down. The police searched her purse and car but did not find other drugs or drug paraphernalia. Story explained to Van Winkle she was facing a life sentence; then he offered her an opportunity to have the charges reduced or dismissed if she would become an informant and provide the police with information regarding either a significant person or a number of people who were involved in drugs. Although Van Winkle expressed a willingness to cooperate, Story became convinced she was not being truthful or reliable and terminated the discussion.

Although the meeting was to be auditorially monitored, there were problems and Officers Story and Jackson were able to hear only parts of the conversation. Story and Jackson did overhear Van Winkle's comment as to the similarity between the cocaine involved and other cocaine Van Winkle had seen in Junction City.

Van Winkle gave a different version of the events to the jury. She admitted that she had previous drug convictions and was recently released from prison, but denied using drugs since her release. She testified Crowell kept coming over to her motel room to ask for food, shampoo, soap, and rides. When Crowell came over the day of the arrest, Van Winkle told him to leave her alone. After Van Winkle returned from dinner, Crowell came back to her room and asked her for a ride to his girlfriend's place. Crowell had Van Winkle drive to a motel. Van Winkle stated she initially refused to accompany Crowell to the motel room. He convinced her to go to the room. As they approached the motel room Crowell handed her a wad of money and asked her to count it. Inside the room, Crowell and Homman first talked about tattoos and then discussed drugs. She testified that she did not want to be there but "played along." After counting the money, she gave it back to Crowell. Van Winkle claimed she did not handle the drugs.

Van Winkle stated that after the police arrested her, they told her she would receive a life sentence unless she agreed to become an informant. On cross-examination, Van Winkle claimed Homman and Crowell were lying as to what went on inside the motel room. She admitted she may have told Homman the cocaine looked like other cocaine she had seen around Junction City.

The jury was instructed on the defense of entrapment and to carefully evaluate the credibility of Crowell as a confidential informant. The jury found Van Winkle guilty of possession of cocaine. The court sentenced her to life in prison because of her two prior cocaine possession convictions and placed her on five years probation. The court later revoked her probation and reinstated the sentence.

## WAS THE GOVERNMENT CONDUCT OUTRAGEOUS?

Whether the government's conduct is sufficiently outrageous is a question of law and depends on four factors: the type of criminal activity involved, whether the activity is preexisting or instead "instigated" by the government, whether the government is directing

the activity or merely participating in it, and the causal link between the government's conduct and the acts of the defendant. *Nelson*, 249 Kan. at 696.

## *The type of activity involved*

The type of governmental activity is important because certain crimes, particularly drug crimes, require giving law enforcement " 'flexibility adequate to counter effectively such criminal activity.' " 249 Kan. at 696 (quoting *United States v. Brown*, 635 F.2d 1207 [6th Cir. 1980]). The use of "reverse stings," in which the undercover agent offers to sell drugs to defendants in order to charge the defendants with possession, has been recognized by this court in the recent case of *State v. Starks*, 249 Kan. 516, 820 P.2d 1243 (1991).

Van Winkle contends the State instigated the crime and specifically targeted her by paying Crowell extra for cases involving cocaine and/ or repeat offenders, by reducing the price so she could afford the purchase, by providing the cocaine, and by Crowell's conduct in picking up the money and cocaine and handing them to Homman and Van Winkle, respectively.

The evidence, however, indicates Van Winkle was not targeted until she told Crowell she wanted to deal in drugs and he then informed the police of her interest. The State's evidence showed she instigated the crime. The fact an informant-witness was compensated goes to credibility and is for the jury to assess. *U.S. v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987). The use of informants to infiltrate criminal enterprises is a recognized and permissible means of investigation by the government. This proposition remains true even though an informant or government agent engages in some criminal activity or supplies something of value to the criminal enterprise. *State v. Nelson*, 249 Kan. 689, Syl. ¶ 6, 822 P.2d 53 (1991).

## *Direction of the activity*

The police did direct some of the activity. They set the initial amount and price but Van Winkle, because of her financial condition, negotiated for a lesser amount. She also informed Homman she wanted rock, not powder, cocaine. Excessive government involvement can lead to a violation of due process where the government steps in and manages the criminal activity from start to finish. The government involvement in this case never became excessive. Van

Winkle actively participated in the completion of the crime by negotiating the amount and type of cocaine involved.

*The causal connection*

Van Winkle contends that but for the police conduct, she would not have committed a crime. The evidence, however, indicates that is not true. Crowell testified Van Winkle was purchasing and using cocaine on a daily basis before she attempted to purchase drugs from the government agent. Homman testified Van Winkle mentioned she could have set up other drug deals. In light of the testimony adduced by the State, it is apparent Van Winkle was already engaged in criminal drug activity.

In assessing Van Winkle's predisposition, the jury was instructed that these factors are to be considered:

(a) circumstances at the time of the sale,

(b) setting the price of the drug by the defendant,

(c) solicitation by the defendant to make the deal, or

(d) prior deals by the defendant. See PIK Crim. 3d 54.14.

Van Winkle asserts that predisposition to commit a crime does not bar the use of the defense of outrageous government conduct. We determined otherwise in Nelson. When predisposition exists, the defense of denial of due process of law by abusive government conduct is also unavailable. *Nelson,* 249 Kan. 689, Syl. ¶ 4.

In *Nelson,* we cited *Hampton v. United States,* 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646 (1976). We note it was a plurality in *Hampton* that found predisposition was a bar to the defense of entrapment. In Hampton, Chief Justice Burger and Justices White and Rehnquist agreed that predisposition barred this defense. Justices Powell and Blackmun concurred in the result but felt the Court need not reach the issue, at that time, of whether predisposition bars the defense of outrageous government conduct. Justices Brennan, Stewart, and Marshall dissented and felt that the government agent's outrageous conduct should not be tolerated regardless of whether the defendant was predisposed to commit the crime. See *U.S. v. Garza-Juarez,* 992 F.2d 896, 903 (9th Cir. 1993); *U.S. v. Gleason,* 980 F.2d 1183, 1187 (8th Cir. 1992).

The United States Supreme Court, after the *Russell* and *Hampton* decisions, has since revisited this area of the law, but neither time did it either apply the defense of outrageous conduct or reconsider

the issue of whether predisposition should bar the defense. *In Mathews v. United States*, 485 U.S. 58, 99 L. Ed. 2d 54, 108 S. Ct. 883 (1988), the Supreme Court was faced with the issue of whether a defendant can deny commission of the crime and still have the jury instructed on the defense of entrapment. Mathews, a Small Business Administration (SBA) official, allegedly agreed to authorize an SBA loan in return for a bribe. The trial court refused to instruct the jury on entrapment because Mathews would not admit all of the elements of the crime involved. The United States Supreme Court reversed Mathews' conviction and held, under the relevant federal statutes, "that even if the defendant denies one or more elements of the crime, he [or she] is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." 485 U.S. at 62. *Cf. State v. Farmer*, 212 Kan. 163, 167-68, 510 P.2d 180 (1973) (defendant who had admitted all elements except the element of intent entitled to entrapment instruction).

In *Jacobson v. United States*, 503 U.S. 540, 118 L. Ed. 2d 174, 112 S. Ct. 1535 (1992), the defendant was charged with intentionally receiving child pornography through the mail. Jacobson had ordered and received nude photos of minors at a time when the receipt of these materials was not yet illegal. After receipt of these materials became prohibited under federal law, federal postal inspectors found Jacobson's name on a mailing list maintained by the seller of the materials previously received by Jacobson. The postal inspectors repeatedly, under the guise of fictitious organizations, sought to induce Jacobson to order materials which are now prohibited from being received through the mail. Jacobson, after two years of government mailings, finally succumbed and ordered one magazine. After the controlled delivery and arrest, a search of Jacobson's home only yielded the earlier materials and no other evidence Jacobson was actively engaged in possessing child pornography.

The jury was instructed on the defense of entrapment, and it convicted Jacobson. The Supreme Court reversed the conviction, finding that as a matter of law, the government had failed to produce sufficient evidence to support the jury's conclusion that Jacobson's predisposition existed prior to the government's repeated attempts to solicit orders from Jacobson. The only evidence of predisposition came after two years of governmental prodding and persuasion.

The United States Supreme Court has not repudiated its indication in *Hampton* that predisposition bars the defense of outrageous government conduct. Unless it does so, we reaffirm our holding in *Nelson* that predisposition precludes a defendant from raising a claim of outrageous government conduct.

## OTHER COURTS' DECISIONS
## FINDING OUTRAGEOUS GOVERNMENT CONDUCT

Other courts have examined certain government activities and found the government agents' conduct to be outrageous. In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), the government set up a drug laboratory for Twigg, through an informant, at no cost to the defendant. The Third Circuit reversed the conviction in finding DEA agents set the defendant up and provided the necessary supplies and technical expertise; when Twigg and the informant "encountered difficulties in consummating the crime, they assisted in finding solutions." 588 F.2d at 381. The government's conduct created additional crimes solely to press more charges against Twigg, without any indication Twigg was involved in any illegal activity. 588 F.2d at 381.

In *State v. Glosson*, 462 So. 2d 1082 (Fla. 1985), the Florida Supreme Court found that paying a confidential informant a 10% contingency fee on civil forfeitures connected with any *successful* prosecutions was per se outrageous government conduct and violative of the defendant's rights to due process. But see *U.S. v. Olson*, 978 F.2d 1472, 1482 (7th Cir. 1992), (contingent fee paid to confidential informant, by itself, is not a per se violation of due process).

In *People v. Isaacson*, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978), Isaacson's conviction was reversed where the police had physically beat and threatened an informant in order to set up Isaacson. The informant then overcame Isaacson's original unwillingness to participate by playing on the sympathy and past relationship between Isaacson and the informant. Finally, through an "incredible geographical shell game," the informant lured Isaacson across the Pennsylvania state line into New York to allow New York law enforcement agents to arrest Isaacson for violating New York's laws. *Isaacson*, 44 N.Y.2d at 522.

After considering all the evidence in light of the factors previously discussed, the only conclusion that can be drawn is that the police

conduct involved was not outrageous. No due process violation occurred.

## SUFFICIENCY OF THE EVIDENCE

Van Winkle attacks the sufficiency of the evidence on two grounds: first, because her claim she was entrapped undermines a finding of intent to possess, a requisite element of the crime charged, and second, because the testimony of the confidential informant was unreliable and the remaining evidence is insufficient to support her conviction. Those two claims are discussed separately. We first note our standard of review.

When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Graham*, 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990).

The jury was instructed that although entrapment is an affirmative defense, a predisposition to commit the offense precludes the defense of entrapment. The jury was also instructed that to find Van Winkle not guilty, it had to find the police conduct entrapped the defendant. The jury's verdict does not indicate whether it found Van Winkle was predisposed to commit the offense. By rejecting the defense of entrapment, the jury could have found either that predisposition existed or that the police conduct did not entrap the defendant.

Homman and Crowell both testified Van Winkle did not show any reluctance to participate in the deal. After Crowell offered an ounce for $1,200, Van Winkle countered with an offer to buy a $1/16$ ounce for $150. Van Winkle told Crowell she wanted to deal in drugs. Van Winkle smoked cocaine in front of Crowell, and she told Homman she had sold drugs in Wichita. There is ample evidence to support both a finding of predisposition and that Van Winkle had the requisite intent to possess the cocaine.

Van Winkle's other challenge concerns the credibility of the testimony of Crowell. Although appellate courts generally refrain from weighing questions of credibility, in *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983), this court found that the other uncontradicted evidence cast so much doubt upon the credibility of the State's witness' uncorroborated claim that she was raped that no

rational factfinder could have believed her testimony sufficient to find the defendant guilty beyond a reasonable doubt. That case does not support the facts of this case. Here Crowell's testimony, with limited exceptions, is supported by the testimony of Officers Story and Jackson and Detective Homman. The jury was instructed to carefully scrutinize Crowell's testimony.

It is the function of the jury in a criminal case to determine the weight and credit to be given the testimony of each witness, whether expert or lay in nature. *State v. Grubbs*, 242 Kan. 224, Syl. ¶ 2, 747 P.2d 140 (1987). On appellate review, the credibility of witnesses will not be passed upon, conflicting evidence will not be weighed, and all questions of credibility are resolved in favor of the State. *State v. Jarmon*, 245 Kan. 634, 638, 783 P.2d 1267 (1989). This court looks only to the evidence which supports the verdict, and if the essential elements of the charge are supported by any competent evidence, the conviction must stand. *State v. Dorsey*, 224 Kan. 152, Syl. ¶ 4, 578 P.2d 261 (1978).

Affirmed.