No. 83,056

STATE OF KANSAS, *Appellee*, v. TERRY LEVAR ADAMS, *Appellant*.

(8 P.3d 724)

Opinion filed July 14, 2000.

*Carl E. Cornwell,* of Cornwell Erickson & Johnson, of Overland Park, argued the cause and was on the brief for appellant.

*Terra D. Morehead,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This case addresses: (1) the sufficiency of the evidence, and (2) the district court's decision to overrule defendant's *Batson* objections to the State's alleged race-based peremptory strikes of three potential jurors. *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

Terry Levar Adams appeals from his conviction of first-degree felony murder, K.S.A. 21-3401, aggravated battery, K.S.A. 21-3414, aggravated assault, K.S.A. 21-3410, and criminal possession of a firearm, K.S.A. 1996 Supp. 21-4204.

Our jurisdiction is under K.S.A. 22-3601(b)(1) (a life sentence was imposed).

Finding no error, we affirm.

## FACTS

Adams' convictions arise out of the fatal drive-by shooting of Derrick Rusley in May 1997. Viewing the evidence as we must, the facts are as follows.

Dywand Akins is Rulsey's cousin and was present when Rusley was shot. According to Akins, Rusley, himself, and a number of

other individuals were outside in an area in Kansas City, Kansas, known as Juniper Gardens. At approximately 6 p.m. they heard a screech of tires. A blue Monte Carlo stopped directly in front of Akins and his companions. Three men exited the Monte Carlo with guns drawn and began firing. The men wore red tee-shirts and red baseball caps. They had red bandannas around their faces. Akins escaped unharmed. He identified Adams, the defendant, as the driver of the Monte Carlo and the shooter who killed Rusley. Akins saw the blue Monte Carlo parked in the area the day of the shooting. According to Akins, Adams was in the driver's seat of the Monte Carlo.

Christian Webb was injured during the shooting. Webb was sitting on her front porch. She observed a person wearing a white tank top with a red "rag" covering his face exit a blue two-door car and begin shooting. Webb ran into her apartment. Later she discovered she had been shot in the foot.

At 6:12 p.m., a "911" operator received a call about the shooting and dispatched officers to the scene. At around the same time, Kishia Watson was driving in the area and observed police cars with sirens en route to the shooting. Watson did not know where the police cars were going. Watson stopped at 1719 Stewart Street, a home where a group of young people were socializing. Adams was there. According to Watson, Adams appeared calm, cool, and collected. Adams left 10 to 15 minutes later. Watson left 20 to 30 minutes after arriving. She went to her aunt's house around the corner. At her aunt's house, she learned of the shooting and drove to the Juniper Gardens location. Watson gave a statement concerning her observations of Adams at the Stewart Street gathering. At 7:40 p.m., police discovered an abandoned blue Monte Carlo at 1716 Stewart Street. The car turned out to be stolen.

Angela Banks also testified. Banks saw Adams three different times on the day of the shooting. Banks was standing on a corner near the site of the shooting sometime after 4 p.m., when she saw a blue Monte Carlo drive by. Banks identified Adams as the passenger in the front seat. Later, the Monte Carlo passed by Banks again. The car then made a U-turn and returned a third time, heading toward the shooting site. Banks was unsure of the time.

According to Banks, when the Monte Carlo passed by the second and third times, Adams was "throwing up gang signs," which she demonstrated for the court. Banks explained that Adams was a member of a gang known as the "Bloods." Red handkerchiefs or "flags" and certain hand gestures are symbols of membership in this gang. Banks said the gang signs that Adams was "throwing up" were "Crip Killer" and "Blood." The occupants of the Monte Carlo were also "flagged up,"meaning that they were wearing red bandannas on their faces. According to Banks, when someone is "flagged up," it means a drive-by shooting is about to occur. Banks testified that a few seconds later she heard a screech of tires and shots fired.

## DISCUSSION

Adams takes issue with the sufficiency of the evidence primarily on the ground that there was no physical evidence linking him to the crimes. We review all the evidence in the light most favorable to the prosecution. We affirm if we are convinced that a rational factfinder could have found Adams guilty beyond a reasonable doubt. See *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998).

Adams contends that the bulk of the inculpatory evidence was from the eyewitness testimony of Akins and Banks. He argues the testimony of these two individuals is inconsistent and, therefore, should be disregarded. Specifically, Adams compares Banks' testimony that Adams was a passenger in the Monte Carlo with Akins' testimony that Adams was the driver.

In support of his argument, Adams relies on the following language from *State v. Orr*, 262 Kan. 312, 322, 940 P.2d 42 (1997):

"[W]e accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court *and disregard any conflicting evidence* or other inferences that might be drawn therefrom." (Emphasis added.)

The *Orr* language does not support the proposition that if two witnesses' accounts are different or inconsistent, their testimony must be disregarded. Our inquiry is whether the posited evidence is sufficient under our standard of review. We view testimony in a light most favorable to the State. We look only to the evidence that

supports the verdict. See *State v. Dorsey,* 224 Kan. 152, Syl. ¶ 4, 578 P.2d 261 (1978). We do not weigh conflicting evidence. *State v. Van Winkle,* 254 Kan. 214, 225, 864 P.2d 729 (1993), *cert. denied* 511 U.S. 1144 (1994). If the essential elements of the charges are supported by any competent evidence, the convictions must stand. *Van Winkle,* 254 Kan. at 225.

Akins' and Banks' testimony supports the prosecution. Both witnesses identified Adams in the Monte Carlo on the day of the shooting. Both witnesses also described Adams as wearing a red tee-shirt, red baseball cap, and a red handkerchief that was covering the lower half of his face. Akins identified Adams as the shooter. In addition, the testimony of the two witnesses is not necessarily inconsistent. The jury could have reasonably concluded that Banks was mistaken about Adams being in the passenger seat. The jury could also have reasonably concluded that Adams switched seats between the time that Banks saw him and the time that Akins saw him.

The evidence is sufficient to sustain Adams' conviction despite conflicting testimony. See *State v. Mathenia,* 262 Kan. 890, 901, 942 P.2d 624 (1997); *State v. Clemons,* 261 Kan. 66, 71, 929 P.2d 749 (1996); *State v. Knighten,* 260 Kan. 47, 52-53, 917 P.2d 1324 (1996).

## The *Batson* Objections

Adams contends that the State impermissibly used its peremptory challenges to keep African-Americans off the jury. The panel of prospective jurors consisted of 39 persons, 10 of whom were African-American. One African-American was not considered by agreement of the parties. Both the defense and the State had 12 peremptory challenges during jury selection. The State used half of its 12 peremptories. The State struck six of the nine remaining African-Americans. The defense struck no African-Americans. Ultimately, there were two African-Americans on the jury and one African-American alternate. Adams objected to all six of the State's peremptory strikes as race-based strikes under *Batson.* The district court asked the State to respond, and the prosecutor gave her reasons for striking the six African-Americans. The district court ac-

cepted the State's reasons as racially neutral. Adams now takes issue specifically with the State's explanation of three of its six strikes.

Our standard of review is abuse of discretion. *State v. Harris*, 259 Kan. 689, Syl. ¶ 6, 915 P.2d 758 (1996). We review the district court's findings with deference. *State v. Walston*, 256 Kan. 372, 382, 886 P.2d 349 (1994).

*Batson* held that a State's privilege to strike jurors though peremptory challenges is subject to the 14th Amendment Equal Protection Clause. 476 U.S. at 89. We conduct a three-step test in assessing whether a peremptory challenge violates the Equal Protection Clause under *Batson*. For analysis of *Batson's* three steps, see *Walston*, 256 Kan. at 377.

Adams claims error only in three of the African-American strikes. Thus, we discuss the facts relating to those three.

### (1) A. B.

The State offered two reasons for striking A.B., an educated woman in her mid-fifties: (1) She was actively involved with the ministry, and (2) she expressed a concern about being on the jury because she had connections to the area. Defense counsel countered these assertions, arguing that another juror was actively involved in the ministry rather than A.B. The State responded by stating that A.B.'s husband was a minister. Defense counsel agreed.

Adams now argues that the State's reasons for striking A.B. were pretextual. This argument is not persuasive. The prosecutor emphasized that she has consistently excluded jurors with ties to the ministry throughout her career, and defense counsel agreed that A.B.'s husband was a minister. The State also noted that A.B. had dealings in the area of the shooting. A.B. mentioned that she had been on the board of directors at Turner House, which is located at 3rd and Stewart, and interfaced with some young people in the area. (We find nothing in the record to support the State's suggestion that A.B. had concerns about serving as a juror.) The second step of the *Batson* process does not demand an explanation that is persuasive, or even plausible, but merely facially valid. See *State v. Vargas*, 260 Kan. 791, Syl. ¶ 3, 926 P.2d 223 (1996). The district

court did not abuse its discretion in accepting the State's reasons for striking A.B.

### H.C. and C.J.

The State explained that it struck H.C. and C.J. because they had children that were approximately the same age as Adams. H.C.'s children were ages 1, 16, 18, and 21. C.J.'s children were ages 14, 15, 16, and 19. Adams argues the State's alleged race-neutral reason for striking H.C. and C.J. is also a pretext. There were Caucasian members of the jury who had children of similar ages. As an example, Adams points to D.P., who had children the ages of 21 and 26, and P.M., who had children aged 16 and 27. Adams was 21 at the time of trial.

Adams argues that the determination of whether the State's race-neutral reasons are supported by the record is a question of first impression for this court. Adams is mistaken. In *Walston,* we said:

"The fact that a prosecutor strikes an African-American juror, supposedly for Reason A, but does *not* strike a white juror, who exhibited the same Reason A, is certainly *circumstantial* evidence that the State is purposefully discriminating against African-Americans. This kind of circumstantial evidence may be sufficiently compelling in some cases to convince a trial court that the State is purposefully discriminating and that its race-neutral reasons are pretextual. However, comparison-based circumstantial evidence should not be considered conclusive in every case, as a matter of law." 256 Kan. at 381.

In *Walston,* the comparative analysis advanced on appeal was not presented to the trial court at the time the *Batson* objection was made. We have the same facts here. Adams' counsel failed to point out to the district court that there were white jurors with children the same age as the defendant. From the record, it appears the prosecutor was striking jurors that had children the same age as Adams when he committed the crimes (19), not his age at trial (21). This was Adams' second trial. The jury in the first trial was divided, nine votes to convict and three to acquit. The prosecutor explained that the three individuals who wanted to acquit Adams in his first trial had children the same age as Adams. The prosecutor explained to the district court that she failed to ask prospective jurors from the first trial whether they had children

and what ages the children were. She did not intend to repeat that omission at Adams' second trial. The prosecutor explained, "I struck quite a number of people, both black and white on this panel, because they had children that appeared to be around the same age that Terry Adams *was*."

H.C. had a child age 18. C.J. had a child age 19. Both were excused by the State. The two Caucasian jurors Adams points to did not have children age 18 or 19. D.P.'s children were 21 and 26. P.M.'s children were 16 and 27. The record shows that the prosecutor's strikes were consistent with her race-neutral explanation. She struck jurors who had children the same age (18 or 19) as Adams was at the time of the crime.

We observe that the prosecutor had additional peremptory strikes she could have used in an attempt to remove all African-Americans from the jury. She did not do so. The presence of African-Americans on the jury is one of several factors we consider in deciding whether race-based strikes have occurred. See *State v. Kingsley*, 252 Kan. 761, 779, 851 P.2d 370 (1993); *U. S. v. Grandison*, 885 F.2d 143, 147 (4th Cir. 1989).

Adams carries the ultimate burden of proving purposeful discrimination. See *State v. Arteaga*, 257 Kan. 874, 882, 896 P.2d 1035 (1995). The State's explanations for these strikes satisfy the standard for facial validity put forth in *Purkett v. Elem*, 514 U.S. 765, 131 L. Ed. 2d 834, 115 S. Ct. 1769 (1995). In *State v. Vargas*, 260 Kan. 791, 795, 926 P.2d 223 (1996), we analyzed *Purkett*. We said:

"The *Purkett* court observed that the second step of the *Batson* process does not demand an explanation that is persuasive, or even plausible, but requires merely facial validity of the prosecutor's explanation. It determined further that unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. It concluded that the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike. *Purkett*, 131 L. Ed 2d at 839."

The *Purkett* decision has been criticized for affording attorneys too much leeway in formulating race-neutral justifications for challenges. See generally Cavise, *The Batson Doctrine: The Supreme Court's Utter Failure to Meet the Challenge of Discrimination in Jury Selection*, 1999 Wis. L. Rev. 501, 529-530 (1999). It is im-

portant to emphasize, however, the district judge's authority to reject pretextual race-neutral justifications in executing the third step of the *Batson* test. This step entails a decision as to whether the defense has carried its burden of proving "purposeful discrimination" by the prosecution, a determination resulting from a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson,* 476 U.S. at 93 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 50 L. Ed 2d 450, 97 S. Ct. 555 [1977]). Because the district judge's findings largely will turn on evaluation of the credibility of the prosecutor's explanation, we ordinarily accord his or her findings great deference. See *Batson,* 476 U.S. at 98 n.21.

Adams' *Batson* argument fails. The district court did not abuse its discretion in finding that the State's reasons were racially neutral.

Affirmed.

LOCKETT and ALLEGRUCCI, JJ., concur in the result.